Barry I. Levy, Esq.
Michael A. Sirignano, Esq.
Philip P. Nash, Esq.
RIVKIN RADLER LLP
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

GOVERNMENT EMPLOYEES INSURANCE COMPANY, GEICO INDEMNITY COMPANY, GEICO GENERAL INSURANCE COMPANY and GEICO CASUALTY COMPANY,

                        Plaintiffs,

        -against-

ERIC YOUSHA, D.O.,
YOUSHA MEDICAL WELLNESS P.L.L.C.,
ALAN FRIEDMAN, M.D.,
FUNCTIONAL REHABILITATION MEDICINE OF NY P.C.,
SHMUEL GOLFEYZ, M.D.,
SHMUEL GOLFEYZ, M.D. (a Sole Proprietorship),
ISAAC ASHER,
BHNM TECH SERVICES, INC.,
MARIIA RESHYLOVA,
ZIVERT CORP.,
WELLNESS LINE INC.,
MARC J. PARNES, D.O.,
SHERRIE A. RAWLINS, M.D.,
and
JOHN DOE DEFENDANTS "1"-"10",

                        Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

Docket No.:_____ (    )

**Plaintiff Demands a Trial by Jury**

## <u>COMPLAINT</u>

Plaintiffs, Government Employees Insurance Company, GEICO Indemnity Company, GEICO

General Insurance Company and GEICO Casualty Company (collectively, "GEICO" or "Plaintiffs"), as and for their Complaint against defendants Eric Yousha, D.O., Yousha Medical Wellness P.L.L.C., Alan Friedman, M.D., Functional Rehabilitation Medicine of NY P.C., Shmuel Golfeyz, M.D., Shmuel Golfeyz, M.D. (a Sole Proprietorship), Isaac Asher, BHNM Tech Services Inc., Mariia Reshylova, Zivert Corp., Wellness Line Inc., Marc J. Parnes, D.O., Sherrie A. Rawlins, M.D., and John Doe Defendants "1"-"10" (collectively, the "Defendants"), hereby allege as follows:

## NATURE OF THE ACTION

1.      GEICO brings this action to recover more than $260,000.00 that Defendants wrongfully obtained from GEICO by submitting, and causing to be submitted, thousands of fraudulent No-fault insurance charges relating to medically unnecessary, excessive, illusory, and otherwise non-reimbursable healthcare services, which were the product of a common scheme through which unlicensed laypersons conspired with licensed healthcare professionals to illegally control both professional healthcare corporations and non-medical corporations to dictate the performance of and billing for medically unnecessary services allegedly provided to New York automobile accident victims insured by GEICO ("Insureds"). The medically unnecessary services included medical "consultations", and electrodiagnostic ("EDX") testing consisting of nerve conduction velocity ("NCV") testing and electromyography ("EMG") studies (collectively, the "Fraudulent Services").

2.      In combination with John Doe Defendants "1"-"10" ("John Doe Defendants") who are persons not authorized to practice medicine in New York, Defendants Eric Yousha, D.O. ("Yousha"), Alan Friedman, M.D. ("Friedman"), Shmuel Golfeyz, M.D. ("Golfeyz"), Isaac Asher ("Asher"), Mariia Reshylova ("Reshylova"), Marc J. Parnes, D.O. ("Parnes"), and Sherrie A. Rawlins, M.D. ("Rawlins") engaged in a widescale fraudulent scheme to exploit New York's No-fault insurance law in which GEICO alone was billed approximately $3.6 million for the alleged

2

performance of the Fraudulent Services.

3.      Yousha, Friedman, and Golfeyz (collectively, the "Nominal PC Owners") agreed to falsely hold themselves out as the owners of Yousha Medical Wellness P.L.L.C. ("Yousha Medical"), Functional Rehabilitation Medicine of NY P.C. ("Functional Rehab"), and Shmuel Golfeyz, M.D. (a Sole Proprietorship) ("Golfeyz SP") (collectively, the "PC Defendants") respectively, when at all times the PC Defendants operated under the direction and control of the John Doe Defendants as part of the fraudulent scheme.

4.      Concomitantly with the operation of the PC Defendants, Asher agreed to falsely hold himself out as the owner of BHNM Tech Services Inc. ("BHNM Tech"), and Reshylova agreed to falsely hold herself out as the owner of both Zivert Corp. ("Zivert") and Wellness Line Inc. ("Wellness Line")(collectively, the "Tech Companies"), when at all relevant times the Tech Companies operated under the direction and control of the John Doe Defendants as part of the fraudulent scheme.

5.      Parnes and Rawlins (the "Contractor Physicians") were claimed to be the "treating healthcare providers" who allegedly performed the Fraudulent Services while purportedly employed by the PC Defendants but were at all times independent contractors working with the John Doe Defendants to conceal the John Doe Defendants' operation and management of the fraudulent scheme, including the true ownership and control of the PC Defendants and Tech Companies.

6.      The PC Defendants and Tech Companies (the "Billing Defendants") purport to be legitimate entities, but they operated on a transient basis from numerous multidisciplinary "No-Fault" medical clinics, primarily located in Brooklyn, Queens, and Bronx (the "Clinics"), have no patients of their own, and provided no legitimate or medically necessary services.  In addition to

the unlawful control of the Billing Defendants by the John Doe Defendants, the fraudulent scheme was conducted through the creation and use of illegal referral and kickback arrangements facilitated through, among other things, payments disguised as "rent", that permitted the Billing Defendants to access a steady stream of automobile accident victims, fraudulently bill GEICO and other automobile insurers for millions of dollars in relation to the Fraudulent Services, and exploit the patients for financial gain without regard to genuine patient care.

7.      As part of the scheme, the John Doe Defendants operated the Billing Defendants in a symbiotic relationship, arranging for the billing for the Fraudulent Services to be routinely divided between (i) the Tech Companies billing GEICO for the "technical component", the portion of Fraudulent Services that were allegedly performed by a technician, such as the administration of the NCV test, and (ii) the PC Defendants billing for the "professional component" of the Fraudulent Services that were allegedly performed by a physician, such as the interpretation and analysis of the NCV test.  As a further part of the scheme, the billing submitted by the Billing Defendants uniformly used specific current procedural terminology ("CPT") codes that misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

8.      The Defendants' fraudulent insurance scheme against GEICO and the New York automobile insurance industry was extensive and involved billing to GEICO alone of more than Three Million Six Hundred Thousand Dollars ($3,600,000.00) for the alleged performance of the Fraudulent Services at the Clinics.

9.      In addition to recovering the money wrongfully obtained, GEICO seeks a declaration that it is not legally obligated to pay reimbursement of more than Three Million One Hundred Thousand Dollars ($3,100,000.00) in pending no-fault insurance claims for the

Fraudulent Services because, as discussed below, the Defendants have, at all relevant times, known that the claims for the Fraudulent Services submitted to GEICO were fraudulent because:

(i)     the PC Defendants are unlawfully incorporated and owned, controlled, and managed by unlicensed laypersons;

(ii)    the Fraudulent Services were not medically necessary and were provided – to the extent provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds;

(iii)   the billing codes used for the Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO;

(iv)    the Fraudulent Services were provided – to the extent provided at all – pursuant to the dictates of laypersons not licensed to render healthcare services and through the use of illegal kickback arrangements; and

(v)     in many cases, the Fraudulent Services – to the extent provided at all – were provided by the Contractor Physicians who were independent contractors rather than employees of the PC Defendants.

10.    As discussed herein, the Defendants at all relevant times have known that: (i) the PC Defendants were unlawfully incorporated and owned, controlled, and managed by unlicensed laypersons; (ii) the Fraudulent Services were not medically necessary and were provided – to the extent provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iii) the billing codes used for the Fraudulent Services misrepresented and/or exaggerated the nature, level, and necessity of services that purportedly were provided in order to inflate and/or unbundle the charges submitted to GEICO; (iv) the Fraudulent Services were provided – to the extent provided at all – pursuant to the dictates of unlicensed laypersons and through the use of illegal kickback arrangements; and (v) in many cases, the Fraudulent Services – to the extent provided at all – were provided by the Contractor Physicians

who were independent contractors rather than employees of the PC Defendants.

11.    As such, the Defendants do not now have – and never had – any right to be compensated for the Fraudulent Services that have been billed to GEICO through the Billing Defendants.

12.    The charts annexed hereto as Exhibits "1" – "6" set forth a large, representative sample of the fraudulent claims that have been identified to date that the Defendants have submitted, or caused to be submitted, to GEICO.

13.    The Defendants' fraudulent scheme, which commenced in or about 2022, has continued uninterrupted through the present day, as the Defendants continue to seek collection on pending charges for the Fraudulent Services.  As a result of the Defendants' scheme, GEICO has incurred damages of more than Two Hundred Sixty Thousand Dollars ($260,000.00).


## THE PARTIES

### I.    Plaintiffs

14.    Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company are Nebraska corporations with their principal places of business in Chevy Chase, Maryland. GEICO is authorized to conduct business and to issue automobile insurance policies in New York.

### II.    Defendants

15.    Defendant Yousha resides in, is domiciled in, and is a citizen of New York.  Yousha became licensed to practice medicine in New York on October 10, 2008 and is the purported owner of Yousha Medical.

16.    Defendant Yousha Medical is a New York professional corporation that was incorporated on or about October 18, 2023, with its principal place of business in New York.

17.     Defendant Friedman resides in, is domiciled in, and is a citizen of New Jersey. Friedman became licensed to practice medicine in New York on October 20, 1994 and is the purported owner of Functional Rehab.

18.     Defendant Functional Rehab is a New York professional corporation that was incorporated on or about February 8, 2023, with its principal place of business in New York.

19.     Defendant Golfeyz resides in, is domiciled in, and is a citizen of Maryland.  Golfeyz became licensed to practice medicine in New York on March 21, 2018 and is the purported owner of the Golfeyz SP.

20.     The Golfeyz SP is a sole proprietorship that operates in New York. Golfeyz purports to be the sole principal of the Golfeyz SP.

21.     Defendant Asher resides in, is domiciled in, and is a citizen of New York and is the purported owner of BHNM Tech.

22.     Defendant BHNM Tech is a New York corporation that was incorporated on or about June 16, 2022, with its principal place of business in New York.

23.     Defendant Reshylova resides in, is domiciled in, and is a citizen of New York and is the purported owner of Zivert and Wellness Line.

24.     Defendant Zivert is a New York corporation that was incorporated on or about June 19, 2023, with its principal place of business located at 584 Mayfair Drive, Brooklyn, New York (the "Mayfair Dr. Address"), which is also Reshylova's residence.

25.     Defendant Wellness Line is a New York corporation that was incorporated on or about October 17, 2023, with its principal place of business also at the Mayfair Dr. Address.

26.     In addition to its association with Rehylova, Zivert, and Wellness Line, the Mayfair Dr. Address is also the incorporation address of five (5) separate durable medical equipment

("DME") companies, including companies purportedly owned by Resylova's husband, which were sued by both GEICO and Liberty Mutual in federal lawsuits that alleged complex and multi-million dollar no-fault insurance fraud schemes involving medically unnecessary DME prescribed to their Insureds pursuant to unlawful kickbacks. See, Govt. Emps. Ins. Co., et al. v. Skyline BK, Inc., et al.; 1:23-cv-09522(TAM) (E.D.N.Y. 2023); Liberty Mutual Ins. Co., et al. v. Akiva Ortho Supply LLC., et al.; 1:24-cv-02757(OEM)(SJB) (E.D.N.Y. 2024).

27.    Defendant Parnes resides in, is domiciled in, and is a citizen of New York.  Parnes was licensed to practice medicine in New York on June 2, 1998.

28.    Defendant Rawlins resides in, is domiciled in, and is a citizen of New York. Rawlins became licensed to practice medicine in New York on July 24, 2014.

29.    Rawlins is no stranger to no-fault insurance fraud schemes and was previously sued by GEICO in 2022.  That lawsuit credibly alleged that Rawlins "sold" her medical license and control of her professional corporation and sole proprietorship to John Doe Defendants who then used Rawlins' name and entities to submit approximately $1.75 million in fraudulent billing to GEICO, styled as extracorporeal shockwave therapy and dry-needling services. See, Govt. Emps. Ins. Co., et al., v. Sherrie Ann Rawlins, M.D., et al.; 1:22-cv-07917(BMC) (E.D.N.Y. 2022).

30.    John Doe Defendants "1" – "10" reside, are domiciled in, and are citizens of New York and include persons and/or entities who are presently not identifiable and are not licensed physicians but who participated in the fraudulent scheme perpetrated against GEICO by, among other things, illegally participating in the ownership of the PC Defendants, controlling the Tech Companies, dictating the provision of medically unnecessary services by the PC Defendants and Tech Companies, engaging in illegal financial and kickback arrangements to obtain patient referrals for the PC Defendants and Tech Companies, spearheading the pre-determined fraudulent

protocols used to maximize profits without regard to genuine patient care the provision of medically unnecessary services, and "brokering" or "controlling" access to patients in exchange for illegal kickback payments.

## JURISDICTION AND VENUE

31.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interests and costs, and is between citizens of different states.

32.     Pursuant to 28 U.S.C. § 1331, this Court also has jurisdiction over claims brought under 18 U.S.C. § 1961 et seq. (the Racketeer Influenced and Corrupt Organizations ["RICO"] Act) because they arise under the laws of the United States. In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

33.     Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Eastern District of New York is the District where one or more of the Defendants reside and because this is the District where a substantial amount of the activities forming the basis of the Complaint occurred.

## ALLEGATIONS COMMON TO ALL CLAIMS

34.     GEICO underwrites automobile insurance in New York.

## I.    An Overview of the Pertinent Law Governing No-Fault Reimbursement

35.     New York's No-Fault Laws are designed to ensure that injured victims of motor vehicle accidents have an efficient mechanism to pay for and receive the health care services that they need. Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law §§ 5101, et seq.) and the regulations promulgated pursuant thereto (11 N.Y.C.R.R. §§ 65, et seq.) (collectively referred to as the "No-Fault Laws"), automobile insurers are required to provide

Personal Injury Protection Benefits ("No-Fault Benefits") to Insureds.

36.     No-Fault Benefits include up to $50,000.00 per Insured for necessary expenses incurred for health care goods and services, including medical services.

37.     An Insured can assign his/her right to No-Fault Benefits to health care goods and services providers in exchange for those services.

38.     Pursuant to a duly executed assignment, a health care provider may submit claims directly to an insurance company and receive payment for medically necessary services, using the claim form required by the New York State Department of Insurance (known as "Verification of Treatment by Attending Physician or Other Provider of Health Service" or, more commonly, as an "NF-3"). In the alternative, a health care provider may submit claims using the Health Care Financing Administration insurance claim form (known as the "HCFA-1500 form").

39.     Pursuant to the No-Fault Laws, professional corporations are not eligible to bill for or to collect No-Fault Benefits if they fail to meet any New York State or local licensing requirements necessary to provide the underlying services.

40.     The implementing regulation adopted by the Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.16(a)(12) states, in pertinent part, as follows:

> A provider of health care services is not eligible for reimbursement under section 5102(a)(1) of the Insurance Law if the provider fails to meet any applicable New York State or local licensing requirement necessary to perform such service in New York .... (Emphasis added).

41.     Pursuant to the New York Education Law, professional entities operating in New York must apply for a certificate of authority from the New York Department of Education. See, e.g., N.Y. Educ. Law § 6507(4)(c); N.Y. Bus. Corp. Law § 1503.

42.     These Certificates certify that the individuals organizing the professional service corporation have met the requirement that they be licensed and currently registered to practice in

their respective professions.

43.     Professional entities that operate in New York without obtaining the requisite certificate of authority and authorization are not eligible to receive PIP Benefits.

44.     In New York, only a licensed physician may: (i) practice medicine; (ii) own or control a medical professional corporation; (iii) employ and supervise other physicians; and (iv) absent statutory exceptions not applicable in this case, derive economic benefit from physician services.

45.     Unlicensed non-physicians may not: (i) practice medicine; (ii) own or control a medical professional corporation; (iii) employ and supervise other physicians; or (iv) absent statutory exceptions not applicable in this case, derive economic benefit from physician services.

46.     New York law prohibits licensed healthcare services providers, including physicians, from paying or accepting kickbacks in exchange for patient referrals.  *See*, *e.g.*, New York Education Law §§ 6509-a; 6530(18); and 6531.

47.     New York law prohibits unlicensed persons not authorized to practice a profession, like medicine, from practicing the profession and from sharing in the fees for professional services. *See*, *e.g.*, New York Education Law § 6512, § 6530(11), and (19).

48.     Therefore, under the No-Fault Laws, a health care provider is not eligible to receive No-Fault Benefits if it is fraudulently licensed, if it pays or receives unlawful kickbacks in exchange for patient referrals, if it permits unlicensed laypersons to control or dictate the treatments, or allows unlicensed laypersons to share in the fees for the professional services.

49.     In *State Farm Mut. Auto. Ins. Co. v. Mallela*, 4 N.Y.3d 313, 320 (2005), the New York Court of Appeals confirmed that health care providers that fail to comply with licensing requirements are ineligible to collect No-Fault Benefits, and that insurers may look beyond a facially-valid license to determine whether there was a failure to abide by state and/or local laws.  Similarly,

in *Andrew Carothers, M.D., P.C. v. Progressive Ins. Co.*, 33 N.Y.3d 389, 393  (2019), the New York Court of Appeals reiterated that only licensed physicians may practice medicine in New York because of the concern that unlicensed individuals are "not bound by ethical rules that govern the quality of care delivered by a physician to a patient."

50.     Pursuant to the No-Fault Laws, only health care providers in possession of a <u>direct</u> assignment of benefits are entitled to bill for and collect No-Fault Benefits. There is both a statutory and regulatory prohibition against payment of No-Fault Benefits to anyone other than the patient or his/her health care provider. The implementing regulation adopted by the Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.11, states – in pertinent part – as follows:

> An insurer shall pay benefits for any element of loss … directly to the applicant or ... upon assignment by the applicant ... shall pay benefits <u>directly</u> to providers of health care services as covered under section five thousand one hundred two (a)(1) of the Insurance Law …

51.     Accordingly, for a health care provider to be eligible to bill for and to collect charges from an insurer for health care services pursuant to Insurance Law § 5102(a), it must be the <u>actual</u> provider of the services. Under the No-Fault Laws, a professional corporation is not eligible to bill for services, or to collect for those services from an insurer, where the services were rendered by persons who were not employees of the professional corporation, such as independent contractors.

52.     N.Y. Business Corporation Law § 1507 makes clear that a licensed professional who is a shareholder of a professional corporation (e.g., a licensed physician who is a shareholder of a medical professional corporation) must be engaged in the practice of such profession through the professional corporation for it to be lawfully licensed.

53.     In New York, claims for PIP Benefits are governed by the New York Workers' Compensation Fee Schedule (the "NY Fee Schedule").

54.     When a healthcare services provider submits a claim for PIP Benefits using the

current procedural terminology ("CPT") codes set forth in the NY Fee Schedule, it represents that: (i) the service described by the specific CPT code that is used was performed in a competent manner in accordance with applicable laws and regulations; (ii) the service described by the specific CPT code that is used was reasonable and medically necessary; and (iii) the service and the attendant fee were not excessive.

55.    Pursuant to New York Insurance Law § 403, the NF-3s and HCFA-1500 forms submitted by a health care provider to GEICO, and to all other automobile insurers, must be verified by the health care provider subject to the following warning:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime.

## II.    Defendants' Common Fraudulent Scheme

56.    Beginning in 2022, and continuing through the present day, Defendants, with the aid of the John Doe Defendants, masterminded and implemented a complex fraudulent scheme in which the Billing Defendants were used to bill GEICO and other New York automobile insurers millions of dollars for medically unnecessary, excessive, illusory, and/or otherwise non reimbursable healthcare services.

57.    The charges submitted through the Billing Defendants for the Fraudulent Services were not medically necessary and were provided – to the extent provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds, and were further provided pursuant to the dictates of unlicensed laypersons not permitted by law to render or control the provision of healthcare services.

58.     To obtain access to patients (i.e., Insureds) at the Clinics, the Billing Defendants entered into illegal kickback and referral arrangements with unlicensed laypersons and/or healthcare professionals, including John Doe Defendants, who controlled access to patients at the Clinics and/or were responsible for "brokering" access to patients who would be steered to the Clinics.

59.     The Billing Defendants thereafter subjected Insureds at the Clinics to various medically unnecessary and illusory healthcare services, including cookie-cutter consultations performed as part of Defendants' pre-determined treatment and billing protocol, and purported diagnostic tests with no clinical basis, all solely to maximize profits without regard to genuine patient care.

**A.     Functional Rehab's Unlawful Operations in New York**

60.     As a threshold matter, pursuant to 11 N.Y.C.R.R. § 65-3.16(a)(12), health care services providers are not eligible to collect PIP Benefits if the providers fail "to meet any applicable New York State or local licensing requirement necessary to perform such service in New York. . . ."

61.     Pursuant to the New York Education Law, medical professional entities operating in New York, such as Functional Rehab, must have a certificate of authority from the New York Department of Education and must be properly authorized to do business in New York. See, e.g., N.Y. Educ. Law §§ 6509, 6530; N.Y. Bus. Corp. Law §§ 1503, 1514.

62.     However, Functional Rehab was never property authorized as a professional corporation in New York as they failed to register with the New York Department of Education's Office of Professions.

63.     For example, a search of the New York Education Department's Office of Professions website fails to return any results for Functional Rehab, indicating they failed to

register with the Education Department, and therefore unlawfully operated as a professional health care practice in New York.

64.    All of the claims for Fraudulent Services identified in Exhibit "2" were provided in violation of New York licensing laws, because Functional Rehab at all times lacked the authority to operate as a professional health care practice in New York.

### B.    The Fraudulent Incorporation, Ownership and Operation of the Billing Defendants

65.    The Nominal PC Owners were all recruited over various periods of time by the John Doe Defendants to serve as sham owners of the PC Defendants.

66.    Similarly, Asher and Reshylova (the "Tech Company Owners") were recruited by the John Doe Defendants to serve as sham owners of the Tech Companies.

67.    The PC Defendants and Tech Companies were fraudulently incorporated and/or created in 2022 and 2023 to replace each other in an effort to evade detection by GEICO and allow the Defendants to continue their fraudulent conduct against GEICO and the New York automobile insurance industry.

68.    The John Doe Defendants entered into secret schemes with the Nominal PC Owners in order to circumvent New York law and induce the New York State Education Department to issue a certificate of authority authorizing the PC Defendants to operate as healthcare professional corporations or to permit them to operate as legitimately controlled medical professional practices. Specifically, in exchange for a designated salary or other form of compensation from the John Doe Defendants, the Nominal PC Owners agreed to falsely represent in the certificates of incorporations and related filings with New York State that they were the true shareholders, directors, officers or owners of the PC Defendants, and that they truly owned, controlled, and practiced through them.

69.     The Nominal PC Owners falsely represented in the certificates of incorporations and related filings with New York State that they were the true shareholders, directors, officers, and owners of the PC Defendants, and that they truly owned, controlled, and practiced through the professional corporations and professional practices, knowing that the PC Defendants would be used to submit fraudulent billing to insurers.

70.     Though the Nominal PC Owners were listed as the record owners of the PC Defendants on the Certificates of Incorporation or otherwise identified as the licensed professionals controlling the practices, the Nominal PC Owners exercised no genuine ownership or control over the PC Defendants or the profits that were generated from them.

71.     The Nominal PC Owners have never been the true shareholders, directors, officers, or owners of the PC Defendants, and never had any true ownership interest in or control over their respective professional corporations and practices.

72.     True ownership and control over the PC Defendants has always rested entirely with the John Doe Defendants, who used the facade of the PC Defendants to do indirectly what they are forbidden from doing directly, namely: (i) employ medical professionals; (ii) control those medical professionals' practices; and (iii) charge for and derive an economic benefit from their services.

73.     Similarly, although the Tech Company Owners were listed as the record owners of the Tech Companies on the Certificates of Incorporation, the Tech Company Owners exercised no genuine ownership or control over the Tech Companies or the profits that were generated from them.

74.     True ownership and control over the Tech Companies has always rested entirely with the John Doe Defendants, who used the facade of the Tech Companies to charge for and

derive an economic benefit from their services.

75.     The Nominal PC Owners, Tech Company Owners, and the Billing Defendants relied on the John Doe Defendants for access to patients at the Clinics.

76.     Throughout the course of the Nominal PC Owners and Tech Company Owners' relationships with the John Doe Defendants, all decision-making authority relating to the operation and management of the Billing Providers was vested entirely with the John Doe Defendants.

77.     The John Doe Defendants' decision-making authority relating to the operation and management Billing Defendants included control over the treatment protocols, including what treatments, testing and other services the Insureds received, which Clinics the Billing Defendants would operate from, which collection law firm would be used, and which billing codes would be charged to GEICO.

78.     The John Doe Defendants decision-making authority also included the hiring of the Contractor Physicians who allegedly performed the Fraudulent Services on behalf of the PC Defendants.

79.     The Contractor Physicians were not employees of the PC Defendants but were independent contractors or employees the John Doe Defendants; they were never employees of the PC Defendants or the Nominal PC Owners.

80.     For example, the first date of service GEICO received for the Golfeyz SP was September 29, 2022, with Parnes listed as the treating healthcare provider.  Just one day earlier, on September 28, 2022, Parnes was listed as the treating healthcare provider on behalf a professional corporation purportedly owned by Rawlins that had been the subject of GEICO's federal lawsuit against her.

81.     Similarly, when the scheme transitioned from the Golfeyz SP to Functional Rehab,

Parnes went from being listed as the treating healthcare provider for the Golfeyz SP to Functional Rehab. More specifically, on June 30, 2023 Parnes was listed as the treating healthcare provider for the Golfeyz SP and then beginning on July 5, 2023, Parnes "switched" and was listed as the treating healthcare provider for Functional Rehab.

82.     When the scheme again shifted to Yousha Medical, Parnes went from being listed as the treating healthcare provider for Functional Rehab on March 8, 2024 to the treating healthcare provider for Yousha Medical on March 11, 2024.

83.     In further support of the fact that the Contractor Physicians were independent contractors under the direction and control of the John Doe Defendants, for the month of July 2023, GEICO received billing from four separate entities, including the Golfeyz SP, that each claimed Rawlins was the treating healthcare provider. Similarly, for the month of January 2024, GEICO received billing from four separate entities, including Functional Rehab, that each claimed Rawlins was the treating healthcare provider. Further, for the month of March 2024, GEICO received billing from four separate entities, including Yousha Medical, that each claimed Rawlins was the treating healthcare provider.

84.     The John Doe Defendants' decision-making authority also included control over how the Fraudulent Services were billed to insurers, including GEICO and how the profits of the Billing Defendants were dispersed.

85.     Moreover, the Billing Defendants did not control or maintain their own books or records, including their bank accounts; never selected, directed, and/or controlled any of the individuals or entities responsible for handling any aspect of the Billing Defendants' financial affairs; never controlled the Billing Defendants' accounts receivables; and were unaware of fundamental aspects of how the Billing Defendants operated.

86.     In reality, the Nominal PC Owners and Tech Owners were never anything more than de facto employees of the John Doe Defendants who at all times remained in control of all operations, healthcare services, and profits generated by the Billing Defendants.

87.     Further, as part of the John Doe Defendants' efforts to mask their control of the Billing Defendants , GEICO attempted to verify the claims submitted by all six of the Billing Defendants by way of examinations under oath, but each of the Nominal PC Owners and Tech Owners intentionally refused to appear because they would have been unable to answer key questions about the Billing Providers' operations and their testimony would reveal the John Doe Defendants' secret ownership scheme.

### i.      The Fraudulent Formation of the Golfyez SP

88.     In or about 2022, the John Doe Defendants recruited Golfeyz, a licensed physician who was willing to "sell" them the use of his medical license so that the John Doe Defendants could create the Golfeyz SP using his name, license, and social security number.

89.     Golfeyz is a physician who specializes in gastroenterology and lives in Maryland.

90.     According to public record searches, Golfeyz has practiced gastroenterology in Pennsylvania since at least 2022 and is currently employed by a gastroenterology practice located in Hanover, Pennsylvania.

91.     After its creation by the John Doe Defendants, the Golfeyz SP commenced operations and began billing GEICO for Fraudulent Services with Golfeyz ceding true beneficial ownership and control over the Golfeyz SP to the John Doe Defendants, who caused the Golfeyz SP to submit billing for Fraudulent Services between September 29, 2022 and September 28, 2023.

92.     Based on the arrangement with the John Doe Defendants, Golfeyz would receive a periodic payment in exchange for allowing his name, license, the use of his social security number,

and the use of the Golfeyz SP and would contend that he controlled and operated the Golfeyz SP and supervised the Fraudulent Services if any insurance company ever inquired.

93.    Notably, and in support of the fact that Golfeyz allowed the John Doe Defendants to use his name, medical license, and use of the Golfeyz SP, Golfeyz never treated a single Insured through the Golfeyz SP or performed any of the Fraudulent Services that were billed to GEICO and other automobile insurers.

94.    Rather, virtually all treatment purportedly rendered by the Golfeyz SP and billed to GEICO for the Fraudulent Services was rendered by the Contractor Physicians, who were not employees of the Golfeyz SP and who were instead working under the direction and control of the John Doe Defendants.

### ii.    The Fraudulent Formation of Functional Rehab

95.    In or about 2023, the John Doe Defendants recruited Friedman, a licensed physician who was willing to "sell" them the use of his medical license so that the John Doe Defendants could fraudulently incorporate and create Functional Rehab.

96.    Friedman is a physician who specializes in physiatry and lives in New Jersey.

97.    According to public record searches, Friedman is employed as a Physiatrist and is the Medical Coordinator of a physical and occupational therapy practice that is located in Brooklyn, New York.

98.    After its creation by the John Doe Defendants, Functional Rehab commenced operations and began billing GEICO for Fraudulent Services with Friedman ceding true beneficial ownership and control over Functional Rehab to the John Doe Defendants, who caused Functional Rehab to submit billing to GEICO for the Fraudulent Services between July 5, 2023 and August 12, 2024.

99.     Based on the arrangement with the John Doe Defendants, Friedman would receive a periodic payment in exchange for allowing his name, license, and the use of Functional Rehab and would contend that he controlled and operated Functional Rehab and supervised the Fraudulent Services if any insurance company ever inquired.

100.    Notably, and in support of the fact that Friedman allowed the John Doe Defendants to use his name, medical license, and Functional Rehab, Friedman purportedly treated only four (4) out of the more than five hundred twenty (520) Insureds that Functional Rehab billed to GEICO for the Fraudulent Services.

101.    Rather, virtually all treatment purportedly rendered by Functional Rehab and billed to GEICO for the Fraudulent Services was rendered by the Contractor Physicians who were not employees of Functional Rehab and were instead working under the direction and control of the John Doe Defendants.

### iii.    The Fraudulent Formation of Yousha Medical

102.    In or about 2023, the John Doe Defendants recruited Yousha, a licensed physician who was willing to "sell" them the use of his medical license so that the John Doe Defendants could fraudulently incorporate and create Yousha Medical.

103.    Yousha is a physician who specializes in family medicine and lives in Nassau County, New York.

104.    According to public record searches, Yousha is employed at a family medical practice located in Levittown, New York.

105.    After its creation by the John Doe Defendants, Yousha Medical commenced operations and began billing GEICO for Fraudulent Services with Yousha ceding true beneficial ownership and control over Yousha Medical to the John Doe Defendants, who caused Yousha

Medical to submit billing for Fraudulent Services between March 11, 2024 and July 19, 2024.

106.    Based on the arrangement with the John Doe Defendants, Yousha would receive a periodic payment in exchange for allowing his name, license, and the use of Yousha Medical and would contend that he controlled and operated Yousha Medical and supervised the Fraudulent Services if any insurance company ever inquired.

107.    Notably, and in support of the fact that Yousha allowed the John Doe Defendants to use his name, medical license, Yousha Medical, Yousha purportedly treated only nine (9) out of the over three hundred seventy (370) Insureds that Yousha Medical billed to GEICO for the Fraudulent Services.

108.    Instead, virtually all treatment purportedly rendered by Functional Rehab and billed to GEICO for the Fraudulent Services was rendered by the Contractor Physicians who were not employees of Yousha Medical and were instead working under the direction and control of the John Doe Defendants.

### iv.    The Fraudulent Formation of the Tech Companies

109.    As with the PC Defendants, the Tech Companies were established by the John Doe Defendants who used Asher and Reshylova (the "Tech Company Owners") simply as "on-paper" owners of the Tech Companies.

110.    Based on the arrangement with the John Doe Defendants, the Tech Company Owners would receive a periodic payment in exchange for allowing their names and the Tech Companies to be used and would contend that they controlled and operated the Tech Companies and were familiar with the Fraudulent Services being rendered if any insurance company ever inquired.

111.    The Tech Companies operated in conjunction with Golfeyz SP and Functional

Rehab, with the Tech Companies purporting to perform and bill GEICO for the technical component associated with the Fraudulent Services, while Golfeyz SP and Functional Rehab would simultaneously bill GEICO for the professional component of the Fraudulent Services.

112.    The division of billing for the Fraudulent Services between Golfeyz SP and Functional Rehab on the one hand and the Tech Companies on the other hand was by design, as part of an attempt to stay "under the radar" by reducing the amount of billing coming from any one entity and part and parcel of the efforts of the John Doe Defendants to siphon insurance proceeds from GEICO and other New York automobile insurers.

### C.    Gaining Access to Insureds

113.    The Billing Defendants had no legitimate indicia.  They had no fixed treatment locations of any kind, did not maintain a stand-alone practice, were not the owners or leaseholders in any of the real property from which they purported to provide the Fraudulent Services, did not employ their own support staff, and did not advertise or market their services to the general public.

114.    In fact, the John Doe Defendants controlled the fraudulent scheme using the name of the of Billing Defendants on an itinerant basis from at least forty-five (45) Clinics, primarily located in Brooklyn, the Bronx, and Queens, where they were given access to steady volumes of patients pursuant to the unlawful referral arrangements.  For example, GEICO received billing from all six Billing Defendants for purportedly treating Insureds at the following Clinic locations:

| Clinic - Street Address | Clinic – Borough/County |
|---|---|
| 100 Pennsylvania Ave. | Brooklyn |
| 108 Kenilworth Pl. | Brooklyn |
| 11 E Hawthorne Ave. | Nassau |
| 1165 Myrtle Ave. | Queens |
| 1339 E. Gun Hill Rd. | Bronx |
| 137-42 Guy R Brewer Blvd. | Bronx |
| 172-17 Jamaica Ave. | Queens |
| 2155 Surf Ave. | Brooklyn |

| | |
|---|---|
| 3140 E Tremont Rd. | Bronx |
| 3250 Westchester Ave. | Bronx |
| 540 E. Fordham Rd. | Bronx |
| 611 E 76th St. | Brooklyn |
| 65-06 Roosevelt Ave. | Queens |
| 92-08 Jamaica Ave. | Queens |
| 92-08 Liberty Ave. | Queens |

115.    To obtain access to the Clinics' patient base (*i.e.*, the Insureds), the Defendants entered into illegal financial and kickback arrangements with the unlicensed persons who controlled the Clinics, who provided access to the patients that were treated, or who purported to be treated, at the Clinics. Though ostensibly organized to provide a range of healthcare services to Insureds at a single location, the Clinics in actuality, were organized to supply "one-stop" shops for no-fault insurance fraud.

116.    The Clinics provided facilities for the Defendants, as well as a "revolving door" of healthcare services professional corporations, chiropractic professional corporations, physical therapy professional corporations, and/or a multitude of other purported healthcare providers, all geared towards exploiting New York's no-fault insurance system.

117.    In fact, GEICO received billing from an ever-changing number of fraudulent healthcare providers at many of the Clinics, starting and stopping operations without any purchase or sale of a "practice", without any legitimate transfer of patient care from one professional to another, and without any legitimate reason for the change in provider name beyond circumventing insurance company investigations and continuing the fraudulent exploitation of New York's no-fault insurance system.

118.    For example, GEICO has received billing for purported healthcare services rendered at the Clinic located at 3250 Westchester Avenue, Bronx, New York from a revolving door of more than one hundred forty (140) purportedly different healthcare providers.

119.    As additional examples, GEICO also received billing for purported healthcare services from the Defendants at the following locations, each of which contained an ever-changing number of fraudulent healthcare providers:

(i)    The Clinic located at 92-08 Jamaica Avenue, Queens, was a revolving door of more than 70 purportedly different healthcare providers;

(ii)    The Clinic located at 108 Kenilworth Place, Brooklyn, was a revolving door of more than 70 different purported healthcare providers; and

(iii)    The Clinic located at 137-42 Guy R Brewer Blvd., Bronx, was a revolving door of more than 30 different purported healthcare providers.

120.    At each of the Clinics, unlicensed laypersons, rather than any healthcare professionals working in the Clinics, developed and controlled the patient base. Clinics willingly provided patient access to the Defendants in exchange for kickbacks and other financial incentives because the Clinics were facilities that sought to profit from the "treatment" of individuals covered by no-fault insurance and therefore catered to a high volume of Insureds at the locations.

121.    In general, the referral sources at the Clinics were paid a sum of money in untraceable cash or payments typically disguised as "rent". The payments were, in reality, kickbacks for referrals, and the relationship was a "pay-to-play" arrangement. In connection with this arrangement, when an Insured visited one of the Clinics, he or she was automatically referred by one of the Clinic's "representatives" for the performance of the Fraudulent Services.

122.    The Defendants' ability to pay kickbacks was continually fueled by the thousands of dollars paid by New York automobile insurers, including GEICO, to the Billing Defendants, which was generated by the Fraudulent Services and excessive billing that resulted from the Insureds being referred to the Billing Defendants at the Clinics.

123.    The referrals to the Defendants were made without regard for the medical necessity of the health care services purportedly performed by the Billing Defendants or the Insureds'

individual symptoms or needs. The Fraudulent Services were provided – to the extent they were provided at all – solely for financial gain, not to genuinely treat or otherwise benefit the Insureds.

124.    The Nominal PC Owners, Tech Company Owners, and the Billing Defendants would not have had access to the Clinics and the Insureds but for the payment of kickbacks.

125.    No legitimate healthcare professional, exercising independent judgement in the best interests of patients, would refer or direct Insureds to the Billing Defendants for treatment when the Fraudulent Services that the Billing Defendants purported to perform and/or provided played no genuine role in the treatment or care of the Insureds.

126.    In sum, (i) the Defendants gained access to patients through illegal kickback and referral arrangements with unlicensed laypersons and/or healthcare professionals who "brokered" or "controlled" access to patients at the Clinics, including John Doe Defendants, so that the Defendants could subject Insureds to the Fraudulent Services, solely because of the illegal kickbacks paid by the Defendants; and (ii) the Nominal PC Owners, Tech Company Owners, and the Billing Defendants paid sham "rent" to gain access to patients at the Clinics and to allow the John Doe Defendants to further illegally siphon profits from the Billing Defendants.

**D.    The Common Components of the Fraudulent Scheme**

127.    The John Doe Defendants illegally operated and managed the Billing Defendants and implemented the fraudulent billing and treatment scheme, billing GEICO alone over $3.1 million for the performance of the Fraudulent Services.

128.    As part of the scheme, the John Doe Defendants attempted to limit GEICO's ability to investigate and address the scheme as they shifted operations between and among the Billing Defendants.

129.    For example, billing for Fraudulent Services submitted to GEICO by the Golfeyz

SP and Functional Rehab were accompanied by a separate bill from one of the Tech Companies, with Golfeyz SP and Functional Rehab billing for the "professional component" (*i.e.*, interpreting test results) and the Tech Companies billing for the "technical component" (*i.e.*, administering the tests).

130.    The Defendants also submitted billing for the Fraudulent Services from the PC Defendants in consecutive and also overlapping fashion with billing for Fraudulent Services being received:

(i)     From the Golfeyz SP for dates of service between September 29, 2022 and September 28, 2023;

(ii)    From Functional Rehab for dates of service between July 5, 2023 and August 12, 2024; and

(iii)   From Yousha Medical for dates of service between March 11, 2024 and July 19, 2024.

131.    Similarly, the Tech Companies submitted billing for the purported performance of the technical component of the Fraudulent Services, which was submitted in conjunction with the billing submitted by the PC Defendants and also in consecutive and also overlapping fashion, with billing received:

(i)     From BHNM Tech for dates of service between June 16, 2022 and September 28, 2023;

(ii)    From Zivert Corp for dates of service between July 5, 2023 and October 22, 2023; and

(iii)   From Wellness Line for dates of service between October 12, 2023 and March 8, 2024.

132.    In further support of the fact that the PC Defendants and Tech Companies were part of a common scheme and under the direction and control of the John Doe Defendants: (i) both the Golfeyz SP and BHNM Tech had the identical last date of service billed to GEICO (September 28,

2023); and (ii) Functional Rehab and Zivert Corp both began billing GEICO on that same date (July 5, 2023). This type of coordination could not be possible without the involvement of the John Doe Defendants.

133.    In further support of the fact that the Defendants operated as one common scheme under the control of the John Doe Defendants, the Billing Defendants each used virtually identical forms. For example:

| PC Defendant | Example Evaluation Form |
|---|---|
| Golfeyz SP |  |



**Functional Rehab**

EVALUATION DATE: 11-20-23

PATIENT NAME: █████

DOB: █████ SEX: █████ DATE OF LOSS: 10-6-23

**ELECTRODIAGNOSTIC HISTORY AND PHYSICAL EVALUATION**

☑ Patient was referred for an electrodiagnostic evaluation
☑ Chart and available imaging records were reviewed

**HPI** The above-named patient presented with and/or reported the following

**Chief Complaint(s)**

• Cervical neck pain / (with/without) radiation down (right/left/bilateral) upper extremity(ies) to _____

• With/ without numbness/ tingling/ weakness/ pain/ stiffness in (right/left/bilateral) _____

• Thoracic/ lumbar/ back pain / (with/without) radiation down (right/left/bilateral) lower extremity(ies) to _____

• With/ without numbness/ tingling/ weakness/ pain/ stiffness in (right/left/bilateral) _____

• With/ (without) bladder/ bowel problems/ fevers/ night sweats/ recent weight loss

• Pain/ weakness/ instability R / L / B Shoulder(s), R/L /B Hand(s), R / L / B Wrist(s)

• Pain /weakness / instability R / L / B Hip(s), R / L / B Knee(s), R / L / B Ankle(s)/Foot/Feet

| Region | Pain Quality | Alleviating Factor | Exacerbating Factor | Setting/ Timing | Pain Intensity |
|---|---|---|---|---|---|
| Head | | | | | |
| Cervical | | | | | |
| ( ) | | | | | |
| ( ) | | | | | Lf |
| Thoracic | | | | | |
| Lumbar | | | | | |
| ( ) | | | | | |

**Past Medical History** Diabetes Y/N      Pacemaker Y / N

---

**Yousha Medical**

EVALUATION DATE: 3/1/2024

PATIENT NAME: █████

DOB: █████ SEX: █████ DATE OF LOSS: 2/20/2024

**ELECTRODIAGNOSTIC HISTORY AND PHYSICAL EVALUATION**

☑ Patient was referred for an electrodiagnostic evaluation
☑ Chart and available imaging records were reviewed

**HPI:** The above-named patient presented with and/or reported the following

**Chief Complaint(s):**

• Cervical neck pain / (with/without) radiation down (right/left/bilateral) upper extremity(ies) to _____

• With/ without numbness/ tingling/ weakness/ pain/ stiffness in (right/left/bilateral) _____

• Thoracic/ lumbar/ back pain / (with/without) radiation down (right/left/bilateral) lower extremity(ies) to _____

• With/ without numbness/ tingling/ weakness/ pain/ stiffness in (right/left/bilateral) _____

• With/ without bladder/ bowel problems/ fevers/ night sweats/ recent weight loss

• Pain/ weakness/ instability R / L / B Shoulder(s), R/L /B Hand(s), R / L / B Wrist(s)

• Pain /weakness / instability R / L / B Hip(s), R / L / B Knee(s), R / L / B Ankle(s)/Foot/Feet

| Region | Pain Quality | Alleviating Factor | Exacerbating Factor | Setting/ Timing | Pain Intensity |
|---|---|---|---|---|---|
| Head | | | | | |
| Cervical | | | | | |
| ( ) | | | | | |
| Thoracic | | | | | |
| Lumbar | | | | | |
| ( ) | | | | | |

**Past Medical History:** Diabetes: Y / N      Pacemaker: Y / N

134. Similarly, the reports generated by the Tech Companies were virtually identical, including: (i) the lack of identifying information regarding the Tech Company that purportedly performed the Fraudulent Services; (ii) the absence of the name of the technician working on behalf of the Tech Company that purportedly performed the Fraudulent Services; and (iii) the use of a Cadwell digital NCV/EMG unit.

135. Additionally, the "Medical Necessity" section of the Tech Companies' reports contained virtually the same boilerplate language regardless of Tech Company or Insured, indicating:

> "The patient's symptoms and neurological signs raise the possibility of peripheral nervous system (spinal cord, nerve roots, peripheral nerves) injury (irritation, compression, stretching). Neurophysiological testing is intended to clarify this clinical suspicion and differentiate nerve root lesion from peripheral nerve lesion."

136. For example:

| Tech Company | Example Report Language |
|---|---|
| BHNM Tech | **Medical Necessity:** Rule out Cervical Radiculopathy/ Polyneuropathy/Carpal Tunnel Syndrome The patient's symptoms and neurological signs raise the possibility of peripheral nervous system (spinal cord, nerve roots, peripheral nerves) injury (irritation, compression, stretching). Neurophysiological testing is intended to clarify this clinical suspicion and differentiate nerve root lesion from peripheral nerve lesion. Abnormal NCV and EMG correlate with less favorable prognosis of recovery and are helpful in further clinical management. If there are signs of focal demyelination and nerve conduction block, the patient may benefit from surgical intervention. If there is diffuse denervation, prognosis of functional recovery is unfavorable. (For details see the actual report) |
| Zivert | **Medical Necessity:** Rule out Cervical Radiculopathy/ Polyneuropathy/Carpal Tunnel Syndrome The patient's symptoms and neurological signs raise the possibility of peripheral nervous system (spinal cord, nerve roots, peripheral nerves) injury (irritation, compression, stretching). Neurophysiological testing is intended to clarify this clinical suspicion and differentiate nerve root lesion from peripheral nerve lesion. Abnormal NCV and EMG correlate with less favorable prognosis of recovery and are helpful in further clinical management. If there are signs of focal demyelination and nerve conduction block, the patient may benefit from surgical intervention. If there is diffuse denervation, prognosis of functional recovery is unfavorable. (For details see the actual report) |

| | |
|---|---|
| Wellness Line | **Medical Necessity:** Rule out Cervical Radiculopathy/ Polyneuropathy/Carpal Tunnel Syndrome<br>The patient's symptoms and neurological signs raise the possibility of peripheral nervous system (spinal cord, nerve roots, peripheral nerves) injury (irritation, compression, stretching). Neurophysiological testing is intended to clarify this clinical suspicion and differentiate nerve root lesion from peripheral nerve lesion. Abnormal NCV and EMG correlate with less favorable prognosis of recovery and are helpful in further clinical management. If there are signs of focal demyelination and nerve conduction block, the patient may benefit from surgical intervention. If there is diffuse denervation, prognosis of functional recovery is unfavorable. (For details see the actual report) |

137.    Further, each of the Billing Defendants used the same address on their billing: 2626 East 14th Street, Suite 201, Brooklyn NY 11235 (the "East 14th St. Address"):

| PROVIDER'S NAME AND ADDRESS*<br>**Functional Rehabilitation Medicine of NY PC**<br>2626 East 14th Street, Suite 201, Brooklyn, NY, 11235 | PROVIDER'S NAME AND ADDRESS*<br>**Bhnm Tech Services INC**<br>2626 East 14th Street, Suite 201, Brooklyn, NY, 11235 |
|---|---|
| PROVIDER'S NAME AND ADDRESS*<br>**Shmuel Golfeyz MD**<br>2626 East 14th Street, Suite 201, Brooklyn, NY, 11235 | PROVIDER'S NAME AND ADDRESS*<br>**Zivert Corp**<br>2626 East 14th Street, Suite 201, Brooklyn, NY, 11235 |
| PROVIDER'S NAME AND ADDRESS*<br>**Yousha Medical Wellness PLLC**<br>2626 East 14th Street, Suite 201, Brooklyn, NY, 11235 | PROVIDER'S NAME AND ADDRESS*<br>**Wellness Line INC**<br>2626 East 14th Street, Suite 201, Brooklyn, NY, 11235 |

138.    The East 14th St. Address is the location of a no-fault collection law firm by the name of Korsunskiy Legal Group P.C. (the "Korsunskiy PC"). The Korsunskiy PC and its principal Denis Korsunskiy ("Korsunskiy") were previously sued by GEICO, and GEICO credibly alleged that Korsunskiy and the Korsunskiy PC falsely claimed to represent a medical doctor and knowingly submitted fraudulent billing to GEICO as part of a widescale no-fault insurance fraud scheme. See, Govt. Emps. Ins. Co., et al. v. Wilkins Williams Medical, P.C., et al., 1:22-cv-04608(KAM)(JRC) (E.D.N.Y. 2022). The Korsunskiy PC and/or Korsunskiy, while not named as defendants, have also been referenced as participants in other federal complaints filed by GEICO that similarly alleged no-fault insurance schemes and the submission of fraudulent billing to GEICO, including the following:

Govt. Emps. Ins. Co., et al. v. Lynn Curcuro Consulting, Ltd., et al., 1:22-cv-04543(ARR)(PK) (E.D.N.Y. 2022); Govt. Emps. Ins. Co., et al. v. Sooraj Poonawala, D.O., et al., 1:22-cv-03063(PKC)(VMS) (E.D.N.Y. 2022); and Govt. Emps. Ins. Co., et al. v. Susan J. Polino Ph.D., et al., 1:22-cv-05178(ARR)(PK) (E.D.N.Y. 2022).

139.    These significant commonalities between the Billing Defendants would not have been possible without common control by the John Doe Defendants.

### E.    The Defendants' Fraudulent Treatment and Billing Protocol

140.    Regardless of the nature of the accidents or the actual medical needs of the Insureds, the Defendants purported to subject the Insureds to a pre-determined fraudulent treatment protocol – to the extent any services were performed at all – without regard for the Insureds' individual symptoms or presentation.

141.    Each step in the Defendants' fraudulent treatment protocol was designed to falsely reinforce the rationale for the previous step and provide a false justification for the subsequent step, thereby permitting the Defendants to generate and falsely justify the maximum amount of fraudulent no-fault billing for each Insured.

142.    The Defendants' common fraudulent treatment and billing protocol resulted in the submission of more than $3.6 million in billing to GEICO for medically unnecessary, excessive, illusory and/or fabricated services, including consultations, nerve conduction velocity ("NCV") testing, and electromyography ("EMG") studies (i.e., the Fraudulent Services).

143.    No legitimate physician or other licensed healthcare provider would permit the fraudulent treatment and billing protocol described below to proceed under his or her auspices. Rather, the Defendants permitted the fraudulent treatment and billing protocol described below to proceed under their auspices because they sought to profit from the fraudulent billing submitted to

GEICO and other insurers.

**1.    The Fraudulent Charges for Consultations Billed Through the PC Defendants**

144.    Upon receiving a referral pursuant to the unlawful financial relationships between the Defendants and the unlicensed laypersons and/or healthcare professionals associated with the Clinics, including the John Doe Defendants, the PC Defendants purported to provide most of the Insureds in the claims identified in Exhibits "1" through "3" with a consultation based on a referral from another healthcare provider.

145.    In keeping with the fact that the consultations were performed pursuant to the unlawful payments that were made through the PC Defendants, the PC Defendants virtually always purported to perform the consultations at the Clinics where they obtained their initial referrals, rather than at any stand-alone practice.

146.    The consultations were performed as a "gateway" in order to provide a false basis to justify the Defendants' exploitation of the Insureds through the PC Defendants' respective medically unnecessary, excessive, and/or illusory services.

147.    In keeping with the fact that the PC Defendants' consultations were not genuine but simply a means to justify their ability to bill for additional services pursuant to a predetermined, fraudulent treatment protocol, the consultations resulted in virtually every Insured receiving at some form of the Fraudulent Services <u>on the same date of service, immediately following the consultation.</u>

148.    Typically, someone associated with the PC Defendants purported to perform the consultations, which were then billed to GEICO through one of the PC Defendants.

149.    The PC Defendants each billed their consultations under CPT code 99243, typically resulting in a charge of $181.54 or $248.33.

150.    The charges for the consultations were fraudulent in that the consultations were medically unnecessary and were performed – to the extent they were performed at all – pursuant to the kickbacks that the Defendants paid at the Clinics in coordination with the John Doe Defendants, not to treat or otherwise benefit the Insureds.

151.    Furthermore, the PC Defendants charges for the consultations were fraudulent in that they misrepresented the nature and extent of the initial consultations.  For example, in every claim identified in Exhibits "1" – "3" for consultations under CPT code 99243, the PC Defendants misrepresented and exaggerated the amount of face-to-face time that the examining healthcare professional spent with the Insureds or the Insureds' families.

152.    The use of CPT code 99243 typically requires that a healthcare professional spend at least 30 minutes of face-to-face time with the Insured or the Insured's family.

153.    Though the PC Defendants billed almost all of their respective consultations under CPT 99243, no healthcare professional associated with the Defendants spent at least 30 minutes on the consultation.

154.    Rather the consultations in the claims identified in Exhibits "1" – "3" rarely lasted more than 10 to 15 minutes.  In keeping with the fact that the PC Defendants' respective consultations rarely lasted more than 10 to 15 minutes, the PC Defendants' respective purported consultations were documented using pre-printed checklist and templated forms, identified above.

155.    The pre-printed forms that the PC Defendants used in conducting the consultations set forth a limited range of potential patient complaints, examination/diagnostic testing options, potential diagnoses, and treatment recommendations.  All that was required to complete the pre-printed checklist or templated forms was a brief patient interview and a perfunctory physical examination of the Insureds.

156.     These interview and examinations did not require the Defendants to spend more than 10 to 15 minutes of face-to-face time with the Insureds during the putative initial examinations and consultations.

157.     Pursuant to the Fee Schedule, when the PC Defendants submitted charges for consultations under CPT code 99243, or caused them to be submitted, they falsely represented that an associated healthcare professional: (i) took a "detailed" patient history; (ii) conducted a "detailed" physical examination; and (iii) engaged in medical decision-making of "low complexity".

### i.      Misrepresentations Regarding the Performance of Consultations

158.     Pursuant to the Fee Schedule, the use of CPT code 99243 to bill for an initial patient encounter represents that the examining physician performed a "consultation" at the request of another physician or other appropriate source.

159.     However, the PC Defendants did not provide their purported "consultations" – to the extent that they are provided at all – pursuant to a legitimate referral from any other physician or other appropriate source. Rather, to the extent that the putative "consultations" were performed in the first instance, they were performed as a result of the illegal kickback payments and pursuant to a fraudulent treatment protocol in order to generate billing for the Defendants.

160.     In keeping with the fact that the PC Defendants did not provide their purported "consultations" at the request of another physician or appropriate source, the supposed "results" of the putative "consultations" were neither transmitted back to any referring physicians or other appropriate sources, nor were the supposed "results" of the putative "consultations" incorporated into any of the Insureds' treatment plans or otherwise acted upon in any way.

161.     Pursuant to the Fee Schedule, the use of CPT code 99243 to bill for a patient

consultation represents that the physician who performed the consultation submitted a written consultation report to the physicians or other appropriate sources who purportedly requested the consultations in the first instance.

162.    However – and, again, in keeping with the fact that the PC Defendants did not provide their purported "consultations" at the request of another physician or appropriate source – the PC Defendants did not submit any written consultation report to any referring physician or other healthcare provider.

163.    In the claims for purported "consultations" identified in Exhibits "1" – "3", the PC Defendants misrepresented the underlying services to be consultations billable under CPT code 99243 because such consultations are reimbursable at a higher rate than commensurate patient examinations.

## ii.    Misrepresentations Regarding "Detailed" Patient Histories

164.    Pursuant to the Fee Schedule, when the PC Defendants submitted charges for consultations under CPT code 99243, they represented that they took a "detailed" patient history.

165.    Pursuant to the American Medical Association's CPT Assistant (the "CPT Assistant"), which is incorporated by reference into the Fee Schedule, a "detailed" patient history requires – among other things – that the examining physician take a history of systems related to the patient's presenting problems, as well as a review of a limited number of additional systems.

166.    However, the PC Defendants did not take a "detailed" patient history from Insureds during its initial examinations and consultations, inasmuch as they did not review systems related to the patients' presenting problems and did not conduct any review of a limited number of additional systems.

167.    Rather, after purporting to provide the initial examinations and consultations, the

PC Defendants simply prepared reports containing ersatz patient histories in order to justify the performance of the Fraudulent Services.

168.    These patient histories did not genuinely reflect the Insureds' actual circumstances and instead were designed solely to support the: (i) purported diagnoses that did not correlate with the patient's actual symptoms or concerns; and (ii) the Defendants' billing to GEICO, and other insurers, for the Fraudulent Services that they purported to provide.

### iii.    Misrepresentations Regarding "Detailed" Physical Examinations

169.    Pursuant to the Fee Schedule, a "detailed" physical examination requires – among other things – that the healthcare services provider conduct an extended examination of the affected body areas and other symptomatic or related organ systems.

170.    Pursuant to the CPT Assistant, in the context of patient examinations, a physician has not conducted an extended examination of a patient's musculoskeletal organ system unless the physician has documented findings with respect to:

(i)    measurement of any three of the following seven vital signs: (a) sitting or standing blood pressure; (b) supine blood pressure; (c) pulse rate and regularity; (d) respiration; (e) temperature; (f) height; (g) weight;

(ii)    the general appearance of the patient – e.g., development, nutrition, body habits, deformities, and attention to grooming;

(iii)    examination of the peripheral vascular system by observation (e.g., swelling, varicosities) and palpation (e.g., pulses, temperature, edema, tenderness);

(iv)    palpation of lymph nodes in neck, axillae, groin, and/or other location;

(v)    brief assessment of mental status;

(vi)    examination of gait and station;

(vii)    inspection and palpation of skin and subcutaneous tissue (e.g., scars, rashes, lesions, café-au-lait spots, ulcers) in at least four of the following six areas:

(a) head and neck; (b) trunk; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; and (f) left lower extremity;

(viii)    coordination;

(ix)    examination of deep tendon reflexes and/or nerve stretch test with notation of pathological reflexes; and

(x)    examination of sensation.

171.    When the PC Defendants billed for their consultations under CPT code 99243, they each falsely represented that they performed a "detailed" patient examination on the Insureds they purported to treat during the initial examinations and consultations.

172.    In fact, the PC Defendants did not conduct a detailed patient examination of Insureds, inasmuch as they did not conduct an extended examination of the affected body areas and other symptomatic or related organ systems.

### iv.    Misrepresentations Regarding the Extent of Medical Decision-Making

173.    Similarly, when the PC Defendants submitted charges for consultations under CPT code 99243, the PC Defendants represented that they engaged in medical decision making of "low complexity."

174.    Pursuant to the CPT Assistant, the complexity of medical decision-making is measured by: (i) the number of diagnoses and/or the number of management options to be considered; (ii) the amount and/or complexity of medical records, diagnostic tests, and other information that must be retrieved, reviewed, and analyzed; and (iii) the risk of significant complications, morbidity, mortality, as well as co-morbidities associated with the patient's presenting problems, the diagnostic procedures, and/or the possible management options.

175.    Though the Defendants routinely falsely represented that their initial examinations and consultations involved medical decision-making of "low complexity", in actuality the

consultations did not involve any medical decision-making at all, and, in the unlikely event that an Insured did present with injuries or symptoms with any degree of complexity, the deficient consultations were incapable of assessing and/or diagnosing them as such.

176.    First, there was no risk of significant complications or morbidity – much less mortality – from the Insureds' relatively minor complaints to the extent that they ever had any complaints arising from automobile accidents at all.

177.    Nor, by extension, was there any risk of significant complications, morbidity, or mortality from the diagnostic procedures or treatment options provided by the Billing Defendants to the extent that the PC Defendants provided any such diagnostic procedures or treatment options in the first instance.

178.    In almost every instance, any diagnostic procedures that the PC Defendants actually provided were limited to a series of medically unnecessary diagnostic tests, none of which were health or life-threatening if properly administered.

179.    Second, the PC Defendants did not consider any significant number of diagnoses or treatment options for Insureds during the initial examinations.

180.    In fact, no healthcare professional associated with the PC Defendants engaged in any medical decision-making at all. Rather, the outcome of the initial examinations and consultations were pre-determined for virtually every Insured to result in boilerplate "diagnoses" that merely: (i) matched the patients' subjective complaints; and (ii) added diagnoses that would justify performance of EMG and NCV testing.

181.    For example, in keeping with the fact that the Defendants performed EMG/NCV studies on virtually every Insured that received a consultation, the result of virtually every PC Defendant consultation included diagnoses cervical and/or lumbar radiculopathy in order to justify

performance the PC Defendants' impending performance of EMG/NCV studies.

182.    In sum, the consultations did not genuinely reflect the Insureds' actual circumstances and instead were designed solely to support the specific Fraudulent Services that the Defendants purported to perform and then billed to GEICO and other automobile insurers.

### 2.    The Fraudulent Charges for Electrodiagnostic Testing (NCV/EMG) Billed Through the Billing Defendants

183.    Based upon the fraudulent, pre-determined "diagnoses" that they purported to provide to Insureds during the purported examinations the Defendants  purported to subject many of the Insureds in the claims identified in Exhibits "1" - "6" to a series of medically unnecessary electrodiagnostic tests, specifically NCV and EMG tests (collectively, the "electrodiagnostic" or "EDX" tests) pursuant to the Defendants' fraudulent treatment and billing protocol designed to financially enrich the Defendants, the Defendants' illegal kickback and referral arrangements, and the dictates of the John Doe Defendants controlling the scheme, rather than to provide genuine care to the Insureds.

184.    As part of the common scheme controlled by the John Doe Defendants, billing for the EDX tests submitted by the Golfeyz SP and Functional Rehab were accompanied by a separate bill from one of the Tech Companies, with Golfeyz SP and Functional Rehab billing for the "professional component" of interpreting the results of the EDX tests and the Tech Companies billing for the "technical component" of administering the tests.

185.    Ultimately, the fraudulent scheme evolved and coalesced with Yousha Medical purportedly performing both the technical and professional components, which obviated the need for a Tech Company to submit a separate bill.

186.    However, each of the Billing Defendants made common misrepresentations in the CPT codes they used to bill GEICO, which intentionally misrepresented both the service

performed and inflated the amount charged to GEICO.

i.    **The Human Nervous System and Legitimate Electrodiagnostic Testing**

187.    The human nervous system is composed of the brain, spinal cord, and peripheral nerves that extend throughout the body, including through the arms and legs and into the hands and feet.

188.    Two primary functions of the nervous system are to collect and relay sensory information through the nerve pathways into the spinal cord and up to the brain, and to transmit signals from the brain into the spinal cord and through the peripheral nerves to initiate muscle activity throughout the body.

189.    The nerves responsible for collecting and relaying sensory information to the brain are called sensory nerves, and the nerves responsible for transmitting signals from the brain to initiate muscle activity throughout the body are called motor nerves.

190.    The peripheral nervous system consists of both sensory and motor nerves. They carry electrical impulses throughout the body, originating from the spinal cord and extending, for example, into the hands and feet through the arms and legs.

191.    The segments of nerves closest to the spine and through which impulses travel between the peripheral nerves and the spinal cord are called the nerve roots. A "pinched" nerve root is called a radiculopathy, and can cause various symptoms and signs including pain, altered sensation, loss of muscle control, and alteration of reflexes.

192.    EMG tests and NCV tests are forms of electrodiagnostic tests and purportedly were provided by Defendants because they were medically necessary to determine whether the Insureds had radiculopathies.

193.    The American Association of Neuromuscular and Electrodiagnostic Medicine

("AANEM"), which consists of thousands of neurologists and physiatrists and is dedicated solely to the scientific advancement of neuromuscular medicine, has adopted a recommended policy (the "Recommended Policy") regarding the optimal use of electrodiagnostic medicine in the diagnosis of various forms of neuropathies, including radiculopathies.

194.    The Recommended Policy accurately reflects the demonstrated utility of various forms of electrodiagnostic tests and has been endorsed by two other premier professional medical organizations, the American Academy of Neurology and the American Academy of Physical Medicine and Rehabilitation.

### ii.    Legitimate NCV Tests

195.    NCV tests are non-invasive tests in which peripheral nerves in the arms and legs are stimulated with an electrical impulse to cause the nerve to depolarize. The depolarization, or "firing," of the nerve is transmitted, measured, and recorded with electrodes attached to the surface of the skin.

196.    An EMG/NCV machine then documents the timing of the nerve response (the "latency"), the magnitude of the response (the "amplitude") and calculates the speed at which the nerve conducts the impulse over a measured distance from one stimulus to another (the "conduction velocity").

197.    In addition, the EMG/NCV machine displays the changes in amplitude over time as a "waveform." The amplitude, latency, velocity, and shape of the response then should be compared with well-defined normal values to identify the existence, nature, extent, and specific location of any abnormalities in the sensory and motor nerve fibers.

198.    There are several motor and sensory peripheral nerves in the arms and legs that can be tested with NCV tests. Moreover, most of these peripheral nerves have both sensory and motor

nerve fibers, either or both of which can be tested with NCV tests.

199.    F-wave and H-reflex studies are additional types of NCV tests that may be performed in addition to the sensory and motor nerve NCV tests. F-wave and H-reflex studies generally are used to derive the time required for an electrical impulse to travel from a stimulus site on a nerve in the peripheral part of a limb, up to the spinal cord, and then back again. The motor and sensory nerve NCV tests are designed to evaluate nerve conduction in nerves within a limb.

200.    According to the Recommended Policy, the maximum number of NCV tests necessary to diagnose a radiculopathy in 90 percent of all patients is: (i) NCV tests of two sensory nerves; (ii) NCV tests of three motor nerves; and (iii) two H-reflex studies.

### iii.    The Fraudulent Charges for NCV Tests

201.    The Defendants, in an attempt to extract the maximum billing out of each Insured who supposedly received NCV tests, routinely: (i) misrepresented the type of testing administered to Insureds by billing CPT code 95905; (ii) purported to perform testing on far more nerves than recommended by the Recommended Policy; and (iii) tested several nerves that are rarely tested in legitimate clinical practice.

202.    As a threshold matter, the Billing Defendants each used CPT code 95905 for their purported NCV testing.

203.    CPT 95905 is a code that may be used in certain contexts to bill for either motor or sensory nerve NCV testing, provided that the testing is conducted using a limited class of NCV devices that are manufactured to employ a preconfigured electrode array which utilizes anatomically specific electrodes to perform both motor and sensory nerve conduction testing

204.    Additionally, CPT Code 95905 is billed on a "per limb" basis, in that it provides

for a single charge for each limb that is tested, regardless of the number of nerves in that limb that are tested, meaning the maximum number of limbs that can be tested (and billed) is four.

205.    In actuality, however, the NCV tests that the Billing Defendants purported to perform and/or provide were not conducted using a preconfigured electrode array. Rather, they were conducted – to the extent that they were conducted at all – using a standard EMG/NCV machine *without* a preconfigured electrode array – meaning the electrodes were a generic shape and not specifically tailored to fit a particular body part.

206.    In fact, each of the reports submitted by the Billing Defendants indicated that the EDX testing was performed using a "Cadwell digital NCV/EMG unit", which uses standard electrodes and does utilize a preconfigured electrode array.

207.    The Defendants decision to use CPT Code 95905 was not based on the nature of the service that was being performed, but rather to exploit the way in which the Fee Schedule divided the technical component/professional component billing, which purportedly allowed the Tech Companies to bill for 96% of the $542.87 Fee Schedule amount and the PC Defendants to bill for only 4% of the Fee Schedule amount, funneling the proceeds to the John Doe Defendants through the Tech Companies.  Had the correct coding been utilized,

208.    The Tech Companies submitted billing to GEICO for two "technical component" units under CPT Code 95905 at $521.16 each, totaling $1,042.32 per bill.

209.    Meanwhile, the Golfeyz SP and Functional Rehab each submitted billing to GEICO for two "professional component" units under CPT Code 95905 at $21.71 each, totaling $43.42 per bill.

210.    Ultimately, Yousha Medical was used by the John Doe Defendants to bill the full Fee Schedule amount of $542.87 for CPT Code 95905.

211.    However, in addition to misrepresenting the type of testing administered to Insureds, Yousha Medical also billed GEICO beyond the four-limb maximum for CPT Code 95905, routinely billing GEICO for 16 units of CPT Code 95905, resulting in thousands of dollars in fraudulent charges on each bill submitted.

212.    What is more, the decision of which nerves to test in each limb and whether to test the sensory fibers, motor fibers, or both sensory and motor fibers in any such peripheral nerve must be tailored to each patient's unique circumstances.

213.    In a legitimate clinical setting, this decision is determined based upon a history and physical examination of the individual patient, as well as the real-time results obtained as the NCV tests are performed on particular peripheral nerves and their sensory and/or motor fibers.

214.    As a result, the nature and number of the peripheral nerves and the type of nerve fibers tested with NCV tests should vary from patient-to-patient.

215.    This concept is emphasized in the Recommended Policy, which states that:

> EDX studies [such as NCVs] are individually designed by the electrodiagnostic consultant for each patient.  The examination design is dynamic and often changes during the course of the study in response to new information obtained.

216.    This concept also is emphasized in the CPT Assistant, which states that "Pre-set protocols automatically testing a large number of nerves are not appropriate."

217.    Even so, the Defendants did not tailor the NCV tests they purported to perform and/or provide to the unique circumstances of each individual Insured.

218.    Instead, the Defendants routinely purported to perform and/or provide NCV tests on the same peripheral nerves and nerve fibers for the Insureds identified in Exhibits "1" – "6", including far more nerve testing than recommended by the Recommended Policy. Specifically, the Defendants purported to perform and provide: (i) NCV tests of eight motor nerves; (ii) NCV tests

of 14 sensory nerves; as well as (iii) two H-reflex studies; and (iv) multiple F-wave studies.

219.    Defendants applied this pattern of excessive NCV testing, pursuant to their pre-determined treatment protocol, by testing the same peripheral nerves and nerve fibers on the left and right sides of Insureds' bodies, regardless of an Insured's individual symptoms.

220.    Similarly, when performing many of the NCV tests they submitted to GEICO, Defendants purported to test the following identical peripheral nerves and nerve fibers, regardless of any particular Insured's individual symptoms: (i) left and right median motor nerves; (ii) left and right ulnar motor nerves; (iii) left and right peroneal motor nerves; (iv) left and right tibial motor nerves; (v) left and right superficial peroneal sensory nerves; (vi) left and right sural sensory nerves; (vii) left and right median sensory nerves; (viii) left and right radial sensory nerves; and (ix) left and right ulnar sensory nerves

221.    This NCV testing protocol included several nerves that are rarely tested in legitimate clinical practice because NCV tests of such nerves are either not justified absent specific clinical concerns or are not warranted because the nerves tested are duplicative of NCV testing of another nerve that is already being tested.

222.    Despite being rarely warranted in legitimate clinical practice, the Defendants purportedly performed an NCV test of the dorsal ulnar cutaneous sensory nerve of virtually every Insured who received an upper extremity NCV study even though there was no indication in virtually any of the records submitted to GEICO by the Defendants or the practitioners who purportedly referred Insureds to the Defendants which indicated a suspicion that any Insured had ulnar neuropathy at the wrist.

223.    Further, NCV testing of the saphenous sensory nerve is rarely performed in legitimate clinical practice because such testing is typically only indicated when the practitioner

suspects femoral neuropathy or a high lumbar plexopathy, which are conditions rarely seen in legitimate clinical practice.

224.    Despite being rarely warranted in legitimate clinical practice, the Defendants purportedly performed an NCV test of the saphenous sensory nerve of virtually every Insured who received a lower extremity NCV study even though there was no indication in virtually any of the records submitted to GEICO by the Defendants or the practitioners who referred Insureds to the Defendants that indicated a suspicion that any Insured had femoral neuropathy or high lumbar plexopathy.

225.    The Defendants knew that performing NCV tests of the radial motor, dorsal ulnar cutaneous sensory, and saphenous sensory nerves was not medically necessary and/or not warranted by the patient's presenting problems. Even so, the Defendants disregarded proper clinical NCV testing standards in favor of fraudulently carrying out the predetermined treatment protocol that the John Doe Defendants devised in order to submit fraudulent billing to GEICO and other insurers.

226.    The Defendants' "cookie-cutter" approach did not reflect individual care towards any patient and instead had as its goal diagnosing radiculopathy based on whatever scant findings were present. As evidence of that fact, Defendants' NCV reports often had medically impossible findings that were not commented on, ostensibly in furtherance of the goal of diagnosing radiculopathy regardless of the actual findings.

227.    For example, it is medically impossible for the amplitude of a motor nerve to be greater proximally (closer to the center of the body – e.g., the elbow) than distally (further away from the center of the body – e.g., the wrist).

228.    It is also medically impossible for the results of F-wave and H-reflex studies, which

are measured in milliseconds to two decimal places, to be identical bilaterally.

229.    The EDX testing performed by the Billing Defendants on multiple Insureds show such results in multiple nerves, but the Contractor Physicians did not comment upon these medically impossible results, because the purpose of the EDX testing was never for the benefit of the Insured but rather to generate billing that could be submitted to GEICO and other automobile insurers so the John Doe Defendants could profit from the scheme. For example:

(i)    On October 19, 2022, **BHNM Tech** purported to perform EDX testing on Insured NT. The results of the EDX testing indicated the amplitude of NT's right median motor nerve was greater when measured at the elbow than at the wrist.  This result is medically impossible and was not commented on by **Parnes** in the report he issued for the **Golfyez SP**.  **Parnes** nevertheless issued a report indicating an "Abnormal Study" with "evidence of left L4-5 lumbar radiculopathy".

(ii)    On February 8, 2023, **BHNM Tech** purported to perform EDX testing on Insured CD. The results of the EDX testing indicated the amplitude of CD's left *and* right ulnar motor nerves and the right median motor nerve were greater when measured at the elbow than at the wrist.  These results are medically impossible and were not commented on by **Parnes** in the report he issued for the **Golfyez SP**.  **Parnes** nevertheless issued a report indicating an "Abnormal Study" with "evidence of left L4-5 lumbar radiculopathy".

(iii)    On March 24, 2023, **BHNM Tech** purported to perform EDX testing on Insured SP. The results of the EDX testing indicated the amplitude of SP's left peroneal motor nerve was greater when measured at the back of the fibula than at the ankle. The results also indicated the F-wave studies of SP's left and right median nerves were identical bilaterally. These results are medically impossible and were not commented on by **Parnes** in the report he issued for the **Golfyez SP**.  **Parnes** nevertheless issued a report indicating an "Abnormal Study" with "evidence of left L4-5 lumbar radiculopathy".

(iv)    On June 6, 2023, **BHNM Tech** purported to perform EDX testing on Insured BK. The results of the EDX testing indicated the amplitude of BK's left peroneal motor nerve was greater when measured at the back of the fibula than at the ankle. This results is medically impossible and was not commented on by **Parnes** in the report he issued for the **Golfyez SP**. **Parnes** nevertheless issued a report indicating an "Abnormal Study" with "evidence of left L4-5 lumbar radiculopathy".

(v)     On June 16, 2023, **BHNM Tech** purported to perform EDX testing on Insured JR. The results of the EDX testing indicated the F-wave study of JR's left and right peroneal nerves were each identical bilaterally, and the H-reflex studies of JR's left and right tibial nerves were also identical bilaterally. These results are medically impossible and were not commented on by **Parnes** in the report he issued for the **Golfyez SP**.  **Parnes** nevertheless issued a report indicating an "Abnormal Study" with "evidence of left L4-5 lumbar radiculopathy".

(vi)    On June 22, 2023, **BHNM Tech** purported to perform EDX testing on Insured JN. The results of the EDX testing indicated the amplitude of JN's left ulnar motor nerve was greater when measured at the elbow than at the wrist.  The results also indicated the amplitude of JN's left peroneal motor nerve was greater at the back of the fibula than at the ankle.  The results also indicated the F-wave study of JN's left and right peroneal nerves were each identical bilaterally, and the H-reflex studies of JN's left and right tibial nerves were also identical bilaterally. These results are medically impossible and were not commented on by **Parnes** in the report he issued for the **Golfyez SP**.  **Parnes** nevertheless issued a report indicating an "Abnormal Study" with "evidence of right C5-6 cervical radiculopathy".

(vii)   On July 6, 2023, **BHNM Tech** purported to perform EDX testing on Insured AC. The results of the EDX testing indicated the amplitude of AC's right median motor nerve was greater when measured at the elbow than at the wrist.  This result is medically impossible and was not commented on by **Rawlins** in the report she issued for the **Golfyez SP**.  **Rawlins** nevertheless issued a report indicating an "Abnormal Study" with "evidence of right C5-6 cervical radiculopathy".

(viii)  On July 7, 2023, **Zivert** purported to perform EDX testing on Insured GG. The results of the EDX testing indicated the amplitude of GG's left *and* right ulnar motor nerves were greater when measured at the elbow than at the wrist. These results are medically impossible and were not commented on by **Parnes** in the report he issued for **Functional Rehab**. **Parnes** nevertheless issued a report indicating an "Abnormal Study" with "evidence of left C5-6 cervical radiculopathy".

(ix)    On July 14, 2023, **Zivert** purported to perform EDX testing on Insured MC. The results of the EDX testing indicated the amplitude of MC's right peroneal motor nerve was greater when measured at the back of the fibula than at the ankle. The results also indicated the F-wave studies of MC's left and right peroneal nerves and their left and right tibial nerves were each identical bilaterally, and the H-reflex studies of JR's left and right tibial nerves were also identical bilaterally. These results are medically impossible and were not commented on by **Parnes** in the report he issued

for **Functional Rehab**. **Parnes** nevertheless issued a report indicating an "Abnormal Study" with "evidence of right L4-5 lumbar radiculopathy".

(x)     On July 17, 2023, **Zivert** purported to perform EDX testing on Insured PL. The results of the EDX testing indicated the amplitude of PL's left *and* right ulnar motor nerves were greater when measured at the elbow than at the wrist. The H-reflex studies of PL's left and right tibial nerves were also identical bilaterally. These results are medically impossible and were not commented on by **Parnes** in the report he issued for **Functional Rehab**. **Parnes** nevertheless issued a report indicating an "Abnormal Study" with "evidence of right L4-5 lumbar radiculopathy".

(xi)    On July 21, 2023, **Zivert** purported to perform EDX testing on Insured JR. The results of the EDX testing indicated the amplitude of JR's left peroneal motor nerve was greater when measured at the back of the fibula than at the ankle. The results also indicated the F-wave studies of JR's left and right peroneal nerves and their left and right tibial nerves were each identical bilaterally, and the H-reflex studies of JR's left and right tibial nerves were also identical bilaterally. These results are medically impossible and were not commented on by **Parnes** in the report he issued for **Functional Rehab**. **Parnes** nevertheless issued a report indicating an "Abnormal Study" with "evidence of left L4-5 lumbar radiculopathy".

(xii)   On July 21, 2023, **Zivert** purported to perform EDX testing on Insured JO. The results of the EDX testing indicated the F-wave studies of JO's left and right peroneal nerves and their left and right tibial nerves were each identical bilaterally, and the H-reflex studies of JO's left and right tibial nerves were also identical bilaterally. These results are medically impossible and were not commented on by **Parnes** in the report he issued for **Functional Rehab**. **Parnes** nevertheless issued a report indicating an "Abnormal Study" with "evidence of left L4-5 lumbar radiculopathy".

(xiii)  On July 21, 2023, **Zivert** purported to perform EDX testing on Insured JC. The results of the EDX testing indicated the F-wave studies of JC's left and right peroneal nerves and their left and right tibial nerves were each identical bilaterally, and the H-reflex studies of JC's left and right tibial nerves were also identical bilaterally. These results are medically impossible and were not commented on by **Parnes** in the report he issued for **Functional Rehab**. **Parnes** nevertheless issued a report indicating an "Abnormal Study" with "evidence of left L4-5 lumbar radiculopathy".

(xiv)   On August 3, 2023, **BHNM Tech** purported to perform EDX testing on Insured DP. The results of the EDX testing indicated the amplitude of DP's left *and* right ulnar motor nerves were greater when measured at the elbow than at the wrist, and also indicated the amplitude of DP's left peroneal motor nerve was greater when measured at the back of the fibula than at the

ankle. The results also indicated the H-reflex studies of DP's left and right tibial nerves were identical bilaterally. These results are medically impossible and were not commented on by **Rawlins** in the report she issued for the **Golfyez SP**. **Rawlins** nevertheless issued a report indicating an "Abnormal Study" with "evidence of left L4-5 lumbar radiculopathy".

(xv)    On August 4, 2023, **Zivert** purported to perform EDX testing on Insured PB. The results of the EDX testing indicated the amplitude of JR's left ulnar motor nerve was greater when measured at the elbow than at the wrist. This result is medically impossible and was not commented on by **Parnes** in the report he issued for **Functional Rehab**. **Parnes** nevertheless issued a report indicating an "Abnormal Study" with "evidence of left L4-5 lumbar radiculopathy".

(xvi)   On August 21, 2023, **Zivert** purported to perform EDX testing on Insured HM. The results of the EDX testing indicated the amplitude of JR's right median motor nerve was greater when measured at the elbow than at the wrist. This result is medically impossible and was not commented on by **Parnes** in the report he issued for **Functional Rehab**. **Parnes** nevertheless issued a report indicating an "Abnormal Study" with "evidence of left L4-5 lumbar radiculopathy".

(xvii)  On August 31, 2023, **BHNM Tech** purported to perform EDX testing on Insured CP. The results of the EDX testing indicated the amplitude of CP's left *and* right median motor nerves were greater when measured at the elbow than at the wrist. These results are medically impossible and were not commented on by **Rawlins** in the report she issued for the **Golfyez SP**. **Rawlins** nevertheless issued a report indicating an "Abnormal Study" with "evidence of bilateral L4-5 lumbar radiculopathy".

(xviii) On August 31, 2023, **BHNM Tech** purported to perform EDX testing on Insured SH. The results of the EDX testing indicated the amplitude of SH's left median motor nerve was greater when measured at the elbow than at the wrist. This result is medically impossible and was not commented on by **Rawlins** in the report she issued for the **Golfyez SP**. **Rawlins** nevertheless issued a report indicating an "Abnormal Study" with "evidence of bilateral C5-6 cervical radiculopathy".

(xix)   On October 30, 2023, **Wellness Line** purported to perform EDX testing on Insured DR. The results of the EDX testing indicated the amplitude of DR's left median motor nerve *and* right ulnar motor nerve were greater when measured at the elbow than at the wrist. These results are medically impossible and were not commented on by **Parnes** in the report he issued for **Functional Rehab**. **Parnes** nevertheless issued a report indicating an "Abnormal Study" with "evidence of right L4-5 lumbar radiculopathy".

(xx) On November 20, 2023, **Wellness Line** purported to perform EDX testing on Insured JM. The results of the EDX testing indicated the amplitude of JM's left ulnar motor nerve was greater when measured at the elbow than at the wrist.  This result is medically impossible and was not commented on by **Parnes** in the report he issued for **Functional Rehab**.  **Parnes** nevertheless issued a report indicating an "Abnormal Study" with "evidence of right L4-5 lumbar radiculopathy".

(xxi) On March 11, 2024, **Yousha Medical** purported to perform EDX testing on Insured MA. The results of the EDX testing indicated the amplitude of MA's left *and* right ulnar motor nerves was greater when measured at the elbow than at the wrist.  These results are medically impossible and was not commented on by **Rawlins** in the report she issued for **Yousha Medical**.  **Rawlins** nevertheless issued a report indicating an "Abnormal Study" with "evidence of right C3-4 cervical radiculopathy".

(xxii) On March 11, 2024, **Yousha Medical** purported to perform EDX testing on Insured HP. The results of the EDX testing indicated the amplitude of HP's left median motor nerve *and* left ulnar motor nerve were greater when measured at the elbow than at the wrist.  These results are medically impossible and was not commented on by **Rawlins** in the report she issued for **Yousha Medical**.  **Rawlins** nevertheless issued a report indicating an "Abnormal Study" with "evidence of bilateral C4-5 cervical radiculopathy".

(xxiii) On March 11, 2024, **Yousha Medical** purported to perform EDX testing on Insured KS. The results of the EDX testing indicated the amplitude of KS's left ulnar motor nerve was greater when measured at the elbow than at the wrist.  The results also indicated the amplitude of KS's right tibial motor nerve was greater when measured at the knee than at the ankle.  These results are medically impossible and was not commented on by **Parnes** in the report he issued for **Yousha Medical**.  **Parnes** nevertheless issued a report indicating an "Abnormal Study" with "evidence of right C5-6 cervical radiculopathy".

(xxiv) On March 11, 2024, **Yousha Medical** purported to perform EDX testing on Insured WG. The results of the EDX testing indicated the F-wave studies of WG's left and right ulnar nerves were both identical bilaterally. These results are medically impossible and was not commented on by **Rawlins** in the report she issued for **Yousha Medical**. **Rawlins** nevertheless issued a report indicating an "Abnormal Study" with "evidence of left C5-6 cervical radiculopathy".

(xxv) On March 11, 2024, **Yousha Medical** purported to perform EDX testing on Insured KAS.  The results of the EDX testing indicated the amplitude of KAS's left tibial motor nerve was greater when measured at the knee than

at the ankle. These results are medically impossible and was not commented on by **Parnes** in the report he issued for **Yousha Medical**. **Parnes** nevertheless issued a report indicating an "Abnormal Study" with "evidence of left L4-5 lumbar radiculopathy".

(xxvi)   On March 21, 2024, **Yousha Medical** purported to perform EDX testing on Insured TR. The results of the EDX testing indicated the amplitude of TR's right median motor nerve *and* right ulnar motor nerve were greater when measured at the elbow than at the wrist. These results are medically impossible and was not commented on by **Parnes** in the report he issued for **Yousha Medical**. **Parnes** nevertheless issued a report indicating an "Abnormal Study" with "evidence of right L4-5 lumbar radiculopathy".

(xxvii)  On April 2, 2024, **Yousha Medical** purported to perform EDX testing on Insured SH. The results of the EDX testing indicated the amplitude of SH's right *and* left median motor nerves was greater when measured at the elbow than at the wrist. The amplitude of SH's right *and* left ulnar motor nerves was also greater when measured at the elbow than at the wrist. These results are medically impossible and was not commented on by **Parnes** in the report he issued for **Yousha Medical**. **Parnes** nevertheless issued a report indicating an "Abnormal Study" with "evidence of left C5-6 cervical radiculopathy".

(xxviii) On April 10, 2024, **Yousha Medical** purported to perform EDX testing on Insured OO. The results of the EDX testing indicated the amplitude of OO's right median motor nerve was greater when measured at the elbow than at the wrist. The amplitude of OO's right peroneal motor nerve also was greater when measured at the back of the fibula than at the ankle. These results are medically impossible and was not commented on by **Parnes** in the report he issued for **Yousha Medical**. **Parnes** nevertheless issued a report indicating an "Abnormal Study" with "evidence of right L4-5 lumbar radiculopathy".

(xxix)   On April 16, 2024, **Yousha Medical** purported to perform EDX testing on Insured KB. The results of the EDX testing indicated the amplitude of KB's right median motor nerve was greater when measured at the elbow than at the wrist. The amplitude of KB's left tibial motor nerve also was greater when measured at the knee than at the ankle. These results are medically impossible and was not commented on by **Parnes** in the report he issued for **Yousha Medical**. **Parnes** nevertheless issued a report indicating an "Abnormal Study" with "evidence of right C5-6 cervical radiculopathy".

(xxx)    On April 25, 2024, **Yousha Medical** purported to perform EDX testing on Insured MW. The results of the EDX test indicated the amplitude of MW's left median motor nerve was greater when measured at the elbow than at the wrist. These results are medically impossible and was not commented on

by **Rawlins** in the report she issued for **Yousha Medical**. **Rawlins** nevertheless issued a report indicating an "Abnormal Study" with "evidence of left C5-6 cervical radiculopathy".

230.    These are representative examples.  In each of the claims identified in Exhibits "1" – "6", the Defendants' EDX tests were performed solely for the purpose of profit and to justify continued treatment for the patient, not for legitimate patient care.

231.    Due to the control of the Billing Defendants by the John Doe Defendants, the Nominal PC Owners and Contractor Physicians sought to diagnose radiculopathy based on whatever scant findings were present and ignored other testing abnormalities in the tests purportedly administered by the Tech Companies or Yousha Medical. By omitting these abnormalities and simply finding radiculopathy, the Defendants justified both their (misrepresented) billing for the test being performed and the referring medical providers' and/or clinic controllers' subsequent billing for further medically unnecessary treatment of the Insured. In sum, the Defendants ignored Insureds' actual medical needs simply because such needs did not fit the Defendants' financial objectives.

### iv.    Legitimate EMGs vs. the Defendants' EMGs

232.    The EMG tests the PC Defendants purported to provide to Insureds were similarly medically unnecessary and excessive.

233.    At the direction of the John Doe Defendants, the PC Defendants also purported to provide medically unnecessary EMGs under CPT Code 95886 to virtually all Insureds who received NCV tests pursuant the Defendants' fraudulent treatment and billing protocol, which was based upon the Defendants' illegal kickback and referral arrangements and designed to financially enrich the John Doe Defendants rather than to provide genuine care to the Insureds.

234.    EMGs involve insertion of a needle into various muscles in the spinal area

("paraspinal muscles") and in the arms and/or legs to measure electrical activity in each such muscle. The electrical activity in each muscle tested is compared with well-defined norms to identify the existence, nature, extent, and specific location of any abnormalities in the muscles, peripheral nerves, and nerve roots.

235.    According to the Recommended Policy, the maximum number of EMGs necessary to diagnose a radiculopathy in 90 percent of all patients is EMGs of two limbs.

236.    The PC Defendants purported to provide and/or perform EMGs to Insureds to determine whether the Insureds suffered from radiculopathies.  In actuality, the EMGs were provided – to the extent they were provided at all – as part of the Defendants' pre-determined fraudulent treatment protocol designed to maximize the billing that they could submit for each Insured.

237.    There are many different muscles in the arms and legs that can be tested using EMGs.  The decision of how many limbs and which muscles to test in each limb should be tailored to each patient's unique circumstances.  In a legitimate clinical setting, this decision is based upon a history and physical examination of each individual patient, as well as the real-time results obtained from the EMGs as they are performed on each specific muscle.  As a result, the number of limbs as well as the nature and number of the muscles tested through EMGs should vary from patient-to-patient.

238.    As with their NCV tests, the PC Defendants did not tailor the EMGs they purported to perform to the unique circumstances of each patient.  Instead, they routinely purported to test the same muscles in the same limbs over and over again, without regard for individual patients' presentation.

239.    Furthermore, even if there were any need for any of the EMGs, the nature and

number of the EMGs that the Billing Defendants purported to provide and/or perform grossly exceeded the maximum number of limbs tested – *i.e.*, EMGs of two limbs – that are necessary in at least 90 percent of all patients with a suspected diagnosis of radiculopathy because the PC Defendants purported to provide and/or perform EMGs on all four limbs on the majority of Insureds identified in Exhibits "1" – "3", in excess and contravention of the Recommended Policy, solely to maximize the profits that they could reap from each Insured.

240.    In keeping with the fact that the purported EMG tests were medically useless, the putative "results" of the PC Defendants' EMG tests were not incorporated into any Insured's treatment plan and they played no genuine role in the treatment or care of the Insureds.

241.    Due to the PC Defendants' control of the PC Defendants and Contractor Physicians, the PC Defendants' billing for and alleged performance of EMG testing was provided pursuant to a predetermined and fraudulent treatment protocol designed to financially enrich the John Doe Defendants, rather than to provide genuine care to the Insureds.

**v.    Implausible Radiculopathy Diagnoses**

242.    Radiculopathies, whether single or multiple level, occur in only nineteen (19%) percent of accident victims according to a large-scale, peer-reviewed 2009 study conducted by Dr. Braddom, Michael H. Rivner, M.D., and Lawrence Spitz, M.D. and published in Muscle & Nerve, the official journal of the AANEM.

243.    Furthermore, the accident victims considered in the study by Drs. Braddom, Rivner, and Spitz had been referred to a tertiary EDX testing laboratory at a major university teaching hospital, and therefore likely represented a more severely injured group of patients than the Insureds whom the Defendants purportedly treated.

244.    As a result, the frequency of radiculopathy in all motor vehicle accident victims –

not only those who have relatively serious injuries that require referral to a major hospital EDX laboratory – is likely to be lower than 19 percent.

245.    Further, a diagnosis of radiculopathy is confidently made in legitimate practice when abnormalities are seen in two limb muscles supplied by the same nerve root but different peripheral nerves and additionally in the paraspinals.

246.    However, the EMGs performed by the Defendants did not identify these types of abnormalities.

247.    Instead, the vast majority of Insureds treated by the Defendants were identified as having abnormalities only in the anterior tibial muscle and/or the bicep.

248.    Abnormalities seen in the anterior tibial muscle could be as a result not only of a radiculopathy but of a plexopathy, sciatic neuropathy, or peroneal neuropathy.

249.    In patients with the only abnormality being seen either in the biceps or anterior tibial, a diagnosis of radiculopathy cannot be confidently made to a specific level.

250.    Nonetheless, the Contractor Physicians and PC Defendants purported to identify single-level cervical and lumbar radiculopathies in the vast majority of the Insureds to whom they purported to provide EDX testing at either the L4-5 or C5-6 level, as demonstrated in the examples above.

251.    Additionally, in legitimate practice a patient with a radiculopathy at L4-5 or C5-6, would also experience abnormalities in a variety of muscles supplied by the C5 or C6 nerve root or the L4 or L5 nerve root, such as the deltoid or brachioradialis in the upper extremities or the peroneus longus, vastus medialis vastus lateralis, or flexor digitorum longus in the lower extremities.

252.    Radiculopathies, whether single or multiple level, occur in only nineteen (19%)

percent of accident victims according to a large-scale, peer-reviewed 2009 study conducted by Dr. Braddom, Michael H. Rivner, M.D., and Lawrence Spitz, M.D. and published in <u>Muscle & Nerve</u>, the official journal of the AANEM.

253.    According to a large-scale, peer-reviewed study conducted by Kurupath Radhakrishnan, M.D., William J. Litchy, M.D., et al. published in the April 1994 edition of <u>Brain</u>, the clinical neurology and neuroscience journal from Oxford University, regarding the epidemiology of cervical radiculopathy among 561 study participants, the distribution of cervical radiculopathy was seen involving nerve roots beyond C5-6, including the C6-7, C7, and C8 levels.

254.    However, the Contractor Physicians and PC Defendants almost exclusively observed cervical radiculopathy at the C5-6 level.

255.    In legitimate practice, a similar distribution to Dr. Radhakrishnan's study would also be expected in the lower extremities involving not just the L4-5 nerve roots but also the L2, L3, and S1 nerve roots.

256.    However, the Contractor Physicians and PC Defendants almost exclusively observed lumbar radiculopathy at the L4-5 level.

257.    It is improbable, to the point of impossibility, that virtually all the Insureds identified in Exhibits "1" – "6" would be observed exclusively with either C5-6 or L4-5 radiculopathy.

258.    Further, it is improbable, to the point of impossibility, that virtually all the Insureds identified in Exhibits "1" – "6" would be diagnosed almost exclusively with this radiculopathy based on abnormalities detected only in the biceps or anterior tibial muscles.

259.    The Contractor Physicians and PC Defendants sought to identify radiculopathy to create the appearance of severe injuries because without radicular injuries being present, there

would be little to no justification for the continued treatment of the patients at the Clinics where the Billing Defendants performed services. In addition, absent the Contractor Physician and PC Defendants' continued finding of radicular injuries, the unlicensed individuals and/or healthcare providers who "brokered" or "controlled" access to patients at the Clinics would no longer continue to maintain the illegal kickback and referral arrangements with the John Doe Defendants controlling the PC Defendants, thereby cutting off the John Doe Defendants' ability to use the Billing Defendants to profit from the fraudulent scheme.

### F. The Fraudulent Billing for Independent Contractor Services through the PC Defendants

260.    The John Doe Defendants' fraudulent scheme also included the submission of claims to GEICO on behalf of the PC Defendants seeking payment for services provided by individuals—specifically, the Contractor Physicians —who were never employed by the Nominal PC Owners or PC Defendants.

261.    Under the New York no-fault insurance laws, professional corporations are ineligible to bill for or receive payment for goods or services provided by independent contractors – the healthcare services must be provided by the professional corporations, themselves, or by their employees.

262.    Since 2001, the New York State Insurance Department consistently has reaffirmed its longstanding position that professional corporations are not entitled to receive reimbursement under the New York no-fault insurance laws for healthcare providers performing services as independent contractors. See DOI Opinion Letter, February 21, 2001 ("where the health services are performed by a provider who is an independent contractor with the PC and is not an employee under the direct supervision of a PC owner, the PC is not authorized to bill under No-Fault as a licensed provider of those services"); DOI Opinion Letter, February 5, 2002 (refusing to modify

position set forth in 2-21-01 Opinion letter despite a request from the New York State Medical Society); DOI Opinion Letter, March 11, 2002 ("If the physician has contracted with the PC as an independent contractor, and is not an employee or shareholder of the PC, such physician may not represent himself or herself as an employee of the PC eligible to bill for health services rendered on behalf of the PC, under the New York Comprehensive Motor Vehicle Insurance Reparations Act…"); DOI Opinion Letter, October 29, 2003 (extending the independent contractor rule to hospitals); DOI Opinion Letter, March 21, 2005 (DOI refused to modify its earlier opinions based upon interpretations of the Medicare statute issued by the CMS).

263.    Virtually every bill submitted to GEICO by the John Doe Defendants via the PC Defendants represented that a Contractor Physician was the "treating provider" who performed the purported Fraudulent Services and therefore was employed by the PC Defendant who submitted the bill.

264.    In reality, these representations were false and virtually all of the purported Fraudulent Services were instead performed by the Contractor Physicians who were not employed by the PC Defendants, but rather operated as independent contractors under the direction of the John Doe Defendants.

265.    As noted above, the Contractor Physicians shifted their "treatment" between the PC Defendants as the John Doe Defendants shifted operations from one PC Defendant to the next.

266.    Further, and as also noted above, this occurred while the Contractor Physicians were concurrently being listed as the "treating provider" for other non-defendant medical entities.

267.    By electing to treat the Contractor Physicians as independent contractors, the PC Defendants realized significant economic benefits – for instance:

(i)    avoiding the obligation to collect and remit income tax as required by 26 U.S.C. § 3102;

(ii)      avoiding payment of the FUTA excise tax required by 26 U.S.C. § 3301 (6.2 percent of all income paid);

(iii)     avoiding payment of the FICA excise tax required by 26 U.S.C. § 3111 (7.65 percent of all income paid);

(iv)     avoiding payment of workers' compensation insurance as required by New York Workers' Compensation Law § 10;

(v)      avoiding the need to secure any malpractice insurance; and

(vi)     avoiding claims of agency-based liability arising from work performed by the health care professionals.

268.    Because virtually all of the purported Fraudulent Services provided by the PC Defendants, to the extent provided at all, were performed by individuals not employed by the PC Defendants, the PC Defendants never had any right to bill or to collect No-Fault Benefits for that reason or to realize any economic benefit from the claims seeking payment Fraudulent Services identified in this Complaint. The misrepresentations and acts of fraudulent concealment outlined in this Complaint were consciously designed to mislead GEICO into believing that it was obligated to pay the claim submissions.

## III.    The Fraudulent Billing the Defendants Submitted or Caused to be Submitted to GEICO

269.    To support their fraudulent charges, the Defendants systematically submitted or caused to be submitted thousands of NF-3, HCFA-1500 forms, and/or treatment reports through the PC Defendants to GEICO seeking payment for the Fraudulent Services for which the Defendants were not entitled to receive payment.

270.    The NF-3, HCFA-1500 forms, and/or treatment reports submitted to GEICO by and on behalf of Defendants were false and misleading in the following material respects:

(i)      The NF-3, HCFA-1500 forms and supporting documentation submitted by and on behalf of the PC Defendants uniformly misrepresented to GEICO

that the PC Defendants were lawfully licensed and, therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12). In fact, the PC Defendants were not properly licensed in that they were professional healthcare corporations that were fraudulently incorporated and/or unlawfully owned and controlled by, and split fees with, the John Doe Defendants, who are not licensed medical professionals, and were not in compliance with all significant statutory and regulatory requirements governing health care practice/and or licensing laws;

(ii)     The NF-3 forms, HCFA-1500 forms, and treatment reports submitted by and on behalf of the Defendants uniformly fraudulently concealed the fact that the Fraudulent Services were provided – to the extent provided at all – pursuant to illegal kickback arrangements amongst the Defendants and others.

(iii)    The NF-3, HCFA-1500 forms and supporting documentation submitted by and on behalf of the Defendants uniformly misrepresented to GEICO that the Fraudulent Services were medically necessary. In fact, the Fraudulent Services, to the extent provided at all, were not medically necessary and were provided pursuant to pre-determined fraudulent protocols designed solely to financially enrich Defendants, rather than to genuinely treat or otherwise benefit the Insureds;

(iv)    The NF-3, HCFA-1500 forms and supporting documentation submitted to GEICO by and on behalf of Defendants uniformly misrepresented and exaggerated the level, nature, and necessity of the Fraudulent Services that purportedly were provided; and

(v)     Virtually all of the NF-3 forms, HCFA-1500 forms, and treatment reports submitted by, and on behalf of, the PC Defendants for Fraudulent Services uniformly misrepresented to GEICO that the Defendants were eligible to receive PIP Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.11 for the services that supposedly were performed. In fact, the PC Defendants were not eligible to seek or pursue collection of PIP Benefits for the services that supposedly were performed because the services were provided by independent contractors, to the extent they were provided at all.

## IV.    **Defendants' Fraudulent Concealment and GEICO's Justifiable Reliance**

271.    Defendants legally and ethically were obligated to act honestly and with integrity in connection with the billing that they submitted, or caused to be submitted, to GEICO.

272.    To induce GEICO to promptly pay the fraudulent charges for the Fraudulent

Services, the Defendants systematically concealed their fraud and went to great lengths to accomplish this concealment.

273.    Specifically, the Defendants knowingly have misrepresented and concealed facts in an effort to prevent discovery that the PC Defendants were in violation of licensing laws, illegally owned and controlled by laypersons, and engaged in fee-splitting and kickback arrangements and, therefore, were ineligible to bill for or collect No-Fault Benefits.

274.    Additionally, the Defendants knowingly misrepresented and concealed facts in an effort to prevent discovery of the fact that the Defendants unlawfully paid kickbacks in exchange for patient referrals.

275.    Additionally, the Defendants entered into complex financial arrangements that were designed to, and did, conceal the fact that the Defendants unlawfully paid kickbacks in exchange for patient referrals.

276.    Furthermore, the Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the Fraudulent Services were medically unnecessary and performed – to the extent they were performed at all – pursuant to fraudulent pre-determined protocols designed to maximize the charges that could be submitted, rather than to benefit the Insureds who supposedly were subjected to the Fraudulent Services.

277.    In addition, the PC Defendants knowingly misrepresented and concealed facts related to the employment status of the Contractor Physicians who rendered services on behalf the PC Defendants in order to prevent GEICO from discovering that the Contractor Physicians performing many of the Fraudulent Services were not employed by the PC Defendants.

278.    Defendants also hired law firms to pursue collection of the fraudulent charges from GEICO and other insurers. These law firms routinely filed expensive and time-consuming litigation

against GEICO and other insurers if the charges were not promptly paid in full, intentionally using legitimate courts of law and arbitral tribunals as tools to monetize their exploitation of the New York No-fault insurance system.

279.    Defendants' collection efforts through numerous separate No-fault collection proceedings, which proceedings may continue for years, are an essential part of their fraudulent scheme since they know it is impractical for an arbitrator or civil court judge in a single No-fault arbitration or civil court proceeding, typically involving a single bill, to uncover or address the Defendants' large scale-scale, complex fraud scheme involving numerous patients across numerous different clinics located throughout the metropolitan area.

280.    GEICO is under statutory and contractual obligations to process claims promptly and fairly within 30 days. The facially valid documents submitted to GEICO in support of the fraudulent charges at issue, combined with the material misrepresentations and fraudulent litigation activity described above, were designed to, and did, cause GEICO to rely upon them. As a result, GEICO incurred damages of more than $260,000.00 based upon the fraudulent charges.

281.    Based upon Defendants' material misrepresentations and other affirmative acts to conceal their fraud from GEICO, GEICO did not discover and could not reasonably have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

## FIRST CAUSE OF ACTION
### Against the PC Defendants and Tech Companies
### (Declaratory Judgment – 28 U.S.C. §§ 2201 and 2202)

282.    GEICO repeats and realleges each and every allegation contained in this Complaint as if fully set forth at length herein.

283.    There is an actual case in controversy between GEICO and the Billing Defendants regarding more than $3.1 million in fraudulent billing for the Fraudulent Services that have been

submitted to GEICO.

284.    The PC Defendants have no right to receive payment from GEICO on the unpaid billing because the billed-for services were submitted through healthcare practices not legitimately owned or controlled by licensed healthcare professionals as required by law, but which were operated, managed, and controlled by the John Doe Defendants for purposes of effectuating a large-scale insurance fraud scheme on GEICO and other New York automobile insurers.

285.    In addition, Functional Rehab has no right to receive payment from GEICO on the unpaid billing because Functional Rehab was not in compliance with all significant laws and regulations and/or licensing laws governing a health care practice during the time period when billing for the Fraudulent Services were submitted to GEICO.

286.    The PC Defendants and Tech Companies have no right to receive payment from GEICO on the unpaid billing because the Fraudulent Services were provided – to the extent provided at all – pursuant to illegal kickback payments made in exchange for patient referrals.

287.    The PC Defendants and Tech Companies have no right to receive payment from GEICO on the unpaid billing because the Fraudulent Services were not medically necessary and were provided – to the extent provided at all – pursuant to predetermined fraudulent protocols that serve to financially enrich the Defendants, rather than to genuinely treat or otherwise benefit the Insureds.

288.    The PC Defendants and Tech Companies have no right to receive payment from GEICO on the unpaid billing because the Fraudulent Services were not medically necessary and were provided – to the extent provided at all – pursuant to the dictates of unlicensed laypersons, not based upon legitimate decisions by licensed healthcare providers.

289.    The PC Defendants and Tech Companies have no right to receive payment from

GEICO on the unpaid billing because the Fraudulent Services fraudulently misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

290.    The PC Defendants have no right to receive payment for any pending bills submitted to GEICO because, in many cases, the Fraudulent Services – to the extent that they were provided at all – were provided by independent contractors, rather than by employees of the PC Defendants.

291.    Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that Defendants have no right to receive payment for any pending bills submitted to GEICO under the names of the PC Defendants and Tech Companies.

<b><u>SECOND CAUSE OF ACTION</u></b><br>
<b>Against the Nominal PC Owners, Tech Company Owners, and John Doe Defendants</b><br>
<b>(Violation of RICO, 18 U.S.C. § 1962(c))</b>

292.    GEICO repeats and realleges each and every allegation contained in this Complaint as if fully set forth at length herein.

293.    The Golfeyz SP, Functional Rehab, Yousha Medical, BHNM Tech, Zivert, and Wellness Line together constitute an association-in-fact "enterprise" (the "EDX Testing Enterprise"), as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

294.    The members of the EDX Testing Enterprise are and have been associated through time, joined in purpose, and organized in a manner amenable to hierarchal and consensual decision making, with each member fulfilling a specific and necessary role to carry out and facilitate its common purpose. Specifically, the Golfeyz SP, Functional Rehab, Yousha Medical, BHNM Tech, Zivert, and Wellness Line are ostensibly independent businesses – with different names and tax identification numbers – that were used as vehicles to achieve a common purpose – namely, to

facilitate the submission of fraudulent charges to GEICO.

295.    The EDX Testing Enterprise operated under six separate names and tax identification numbers in order to limit the time period and volume of bills submitted under any individual name, in an attempt to avoid attracting the attention and scrutiny of GEICO and other New York automobile insurers to the volume of billing and the pattern of fraudulent charges originating from any one business. Accordingly, the carrying out of this scheme would be beyond the capacity of each member of the EDX Testing Enterprise acting singly or without the aid of each other.

296.    The EDX Testing Enterprise is distinct from and has an existence beyond the pattern of racketeering that is described herein, namely by recruiting, employing, overseeing and coordinating many individuals who have been responsible for facilitating and performing a wide variety of administrative and ostensibly professional functions beyond the acts of mail fraud (i.e., the submission of the fraudulent bills to GEICO and other insurers), by creating and maintaining patient files and other records, by recruiting and supervising personnel, by negotiating and executing various contracts and/or illegal verbal agreements, by maintaining the bookkeeping and accounting functions necessary to manage the receipt and distribution of the insurance proceeds, and by retaining collection lawyers whose services also were used to generate payments from insurance companies to support all of the aforesaid functions.

297.    The Nominal PC Owners, Tech Company Owners, and John Doe Defendants have each been employed by and/or associated with the EDX Testing Enterprise.

298.    The Nominal PC Owners, Tech Company Owners, and John Doe Defendants knowingly have conducted and/or participated, directly or indirectly, in the conduct of the EDX Testing Enterprise's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States

mails to submit or cause to be submitted thousands of fraudulent charges seeking payments that the EDX Testing Enterprise was not eligible to receive under the No-Fault Laws, because: (i) the PC Defendants were not in compliance with applicable law and were not legitimately owned or controlled by licensed healthcare professionals as required by law, but were operated, managed, and controlled by the John Doe Defendants; (ii) the Fraudulent Services purportedly performed were not medically necessary; (iii) the Fraudulent Services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (iv) the billing codes used for the Fraudulent Services misrepresented and exaggerated the level of services that were purportedly provided in order to inflate the charges that could be submitted; (v) the Billing Defendants obtained their patients through the Defendants' illegal kickback scheme; and (v) in virtually all cases, the billed-for services were provided – to the extent they were provided at all – by the Contractor Physicians who were independent contractors, rather than employees of the PC Defendants. The fraudulent billings and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibits "1" - "6".

299.    The EDX Testing Enterprise's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular ways in which the Nominal PC Owners, Tech Company Owners, and John Doe Defendants operated the PC Defendants and Tech Companies, inasmuch as the PC Defendants and Tech Companies never operated as legitimate entities and  never were eligible to bill for or collect No-Fault Benefits and acts of mail fraud therefore were essential in order for the PC Defendants and Tech Companies to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as

does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through the PC Defendants and Tech Companies to the present day.

300.    The EDX Testing Enterprise is engaged in inherently unlawful acts inasmuch as it continues to attempt collection on fraudulent billing submitted to GEICO and other New York automobile insurers. These inherently unlawful acts are taken by the EDX Testing Enterprise in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent No-fault billing. GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $260,000.00 pursuant to the fraudulent bills submitted by the Defendants through the EDX Testing Enterprise.

301.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

### THIRD CAUSE OF ACTION
**Against the Nominal PC Owners, Tech Company Owners, Contractor Physicians, and John Doe Defendants**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

302.    GEICO repeats and realleges each and every allegation contained in this Complaint as if fully set forth at length herein.

303.    The EDX Testing Enterprise is an association-in-fact "enterprise" as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

304.    The Nominal PC Owners, Tech Company Owners, Contractor Physicians, and the John Doe Defendants are employed by and/or associated with the EDX Testing Enterprise.

305.    The Nominal PC Owners, Tech Company Owners, Contractor Physicians, and John Doe Defendants knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of the EDX Testing Enterprise's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C.

§ 1341, based upon the use of the United States mails to submit or cause to be submitted fraudulent charges seeking payments that the PC Defendants and Tech Companies were not eligible to receive under the No-Fault Laws because: (i) the PC Defendants were not in compliance with applicable law and were not legitimately owned or controlled by licensed healthcare professionals as required by law, but were operated, managed, and controlled by the John Doe Defendants; (ii) the Fraudulent Services purportedly performed were not medically necessary; (iii) the Fraudulent Services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (iv) the billing codes used for the Fraudulent Services misrepresented and exaggerated the level of services that were purportedly provided in order to inflate the charges that could be submitted; (v) the Billing Defendants obtained their patients through the Defendants' illegal kickback scheme; and (v) in virtually all cases, the billed-for services were provided – to the extent they were provided at all – by the Contractor Physicians who were independent contractors, rather than employees of the PC Defendants. The fraudulent billings and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibits "1" - "6".

306.    The Nominal PC Owners, Tech Company Owners, Contractor Physicians, and John Doe Defendants knew of, agreed to, and acted in furtherance of the common overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of fraudulent charges to GEICO.

307.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $260,000.00 pursuant to the fraudulent bills submitted by Defendants through the EDX Testing Enterprise.

308.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

### FOURTH CAUSE OF ACTION
**Against Golfeyz, the Golfeyz SP, and the John Doe Defendants**
**(Common Law Fraud)**

309.    GEICO repeats and realleges each and every allegation contained in this Complaint as if fully set forth at length herein.

310.    Golfeyz, the Golfeyz SP, and the John Doe Defendants intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent bills seeking payment for the Fraudulent Services.

311.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that the Golfeyz SP was properly licensed and was being legitimately used to bill for the Fraudulent Services, making them eligible for payment pursuant to 11 N.Y.C.R.R. §65-3.16(a)(12) when in fact the John Doe Defendants unlawfully and secretly controlled, operated, and managed the Golfeyz SP; (ii) in every claim, the representation that the Fraudulent Services had been rendered and were reimbursable, when in fact the claim submissions uniformly misrepresented and exaggerated the level, nature, necessity, and results of the Fraudulent Services that purportedly were provided; (iii) in every claim, the representation that the Fraudulent Services were eligible for reimbursement, when in fact the services were provided – to  the extent provided at all – pursuant to an illegal kickback scheme; (iv) in every claim, the representation that the Fraudulent Services were medically necessary when they were provided – to the extent provided at all – pursuant to the dictates of unlicensed laypersons, not based upon legitimate decisions by licensed healthcare providers; and (v) in every claim, the representation that

the billed-for services were provided by employees of Golfeyz and the Golfeyz SP, when in fact virtually all of the billed-for services were provided by the Contractor Physicians. The fraudulent billings and corresponding mailings submitted to GEICO that comprise, in part, the pattern of fraudulent activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibit "1".

312.    Golfeyz, the Golfeyz SP, and the John Doe Defendants intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through the Golfeyz SP that were not compensable under the No-Fault Laws.

313.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $26,000.00 pursuant to the fraudulent bills submitted by Golfeyz, the Golfeyz SP, and the John Doe Defendants through the Golfeyz SP.

314.    Golfeyz, the Golfeyz SP, and the John Doe Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

315.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## FIFTH CAUSE OF ACTION
### Against Golfeyz, the Golfeyz SP, and the John Doe Defendants
### (Unjust Enrichment)

316.    GEICO repeats and realleges each and every allegation contained in this Complaint as if fully set forth at length herein.

317.    As set forth above, Golfeyz, the Golfeyz SP, and the John Doe Defendants have

engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

318.    When GEICO paid the bills and charges submitted by or on behalf of Golfeyz, the Golfeyz SP, and the John Doe Defendants for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on Golfeyz, the Golfeyz SP, and the John Doe Defendants' improper, unlawful, and/or unjust acts.

319.    Golfeyz, the Golfeyz SP, and the John Doe Defendants have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Golfeyz, the Golfeyz SP, and the John Doe Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

320.    Golfeyz, the Golfeyz SP, and the John Doe Defendants' retention of GEICO's payments violates fundamental principles of justice, equity, and good conscience.

321.    By reason of the above, Golfeyz, the Golfeyz SP, and the John Doe Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $26,000.00.

### SIXTH CAUSE OF ACTION
**Against the Contractor Physicians**
**(Aiding and Abetting Fraud)**

322.    GEICO repeats and realleges each and every allegation set forth above as if fully set forth at length herein.

323.    The Contractor Physicians knowingly aided and abetted the fraudulent scheme that was perpetrated on GEICO by Golfeyz, the Golfeyz SP, and the John Doe Defendants.

324.    The acts of the Contractor Physicians in furtherance of the fraudulent scheme included, among other things, knowingly performing the Fraudulent Services pursuant to the dictates of the John Doe Defendants who are unlicensed laypersons, knowingly exaggerating the level, nature, necessity, and results of the Fraudulent Services, and knowingly performing the

Fraudulent Services as independent contractors and not as employees of Golfeyz or the Golfeyz SP.

325.    The conduct of the Contractor Defendants in furtherance of the fraudulent scheme was significant and material.  The conduct of Contractor Defendants was a necessary part of and was critical to the success of the fraudulent scheme because, without their actions, there would have been no opportunity for Golfeyz, the Golfeyz SP, and the John Doe Defendants to obtain payment from GEICO and other insurers.

326.    The Contractor Physicians aided and abetted the fraudulent scheme in a calculated effort to induce GEICO into paying charges to Golfeyz, the Golfeyz SP, and the John Doe Defendants for the medically unnecessary Fraudulent Services because they sought to continue profiting through the fraudulent scheme.

327.    The conduct of the Contractor Physicians caused GEICO to pay more than $26,000.00 pursuant to the fraudulent bills submitted through the Golfeyz SP.

328.    This extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

329.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief that the Court deems just and proper.

## SEVENTH CAUSE OF ACTION
### Against Friedman, Functional Rehab, and the John Doe Defendants
### (Common Law Fraud)

330.    GEICO repeats and realleges each and every allegation contained in this Complaint as if fully set forth at length herein.

331.    Friedman, Functional Rehab, and the John Doe Defendants intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material

facts from GEICO in the course of their submission of hundreds of fraudulent bills seeking payment for the Fraudulent Services.

332.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that Functional Rehab was properly licensed and was being legitimately used to bill for the Fraudulent Services, making them eligible for payment pursuant to 11 N.Y.C.R.R. §65-3.16(a)(12) when in fact Functional Rehab was not properly licensed, and the John Doe Defendants unlawfully and secretly controlled, operated, and managed Functional Rehab; (ii) in every claim, the representation that the Fraudulent Services had been rendered and were reimbursable, when in fact the claim submissions uniformly misrepresented and exaggerated the level, nature, necessity, and results of the Fraudulent Services that purportedly were provided; (iii) in every claim, the representation that the Fraudulent Services were eligible for reimbursement, when in fact the services were provided – to  the extent provided at all – pursuant to an illegal kickback scheme; (iv) in every claim, the representation that the Fraudulent Services were medically necessary when they were provided – to the extent provided at all – pursuant to the dictates of unlicensed laypersons, not based upon legitimate decisions by licensed healthcare providers; and (v) in every claim, the representation that the billed-for services were provided by employees of Friedman and Functional Rehab, when in fact virtually all of the billed-for services were provided by the Contractor Physicians.  The fraudulent billings and corresponding mailings submitted to GEICO that comprise, in part, the pattern of fraudulent activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibit "2".

333.    Friedman, Functional Rehab, and the John Doe Defendants intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Functional Rehab that were not compensable

under the No-Fault Laws.

334.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $12,000.00 pursuant to the fraudulent bills submitted by Friedman, Functional Rehab, and the John Doe Defendants through Functional Rehab.

335.    Friedman, Functional Rehab, and the John Doe Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

336.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

**EIGHTH CAUSE OF ACTION**
**Against Friedman, Functional Rehab, and the John Doe Defendants**
**(Unjust Enrichment)**

337.    GEICO repeats and realleges each and every allegation contained in this Complaint as if fully set forth at length herein.

338.    As set forth above, Friedman, Functional Rehab, and the John Doe Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

339.    When GEICO paid the bills and charges submitted by or on behalf of Friedman, Functional Rehab, and the John Doe Defendants for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on Friedman, Functional Rehab, and the John Doe Defendants' improper, unlawful, and/or unjust acts.

340.    Friedman, Functional Rehab, and the John Doe Defendants have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Friedman, Functional Rehab, and the John Doe Defendants voluntarily accepted notwithstanding their improper, unlawful,

and unjust billing scheme.

341.    Friedman, Functional Rehab, and the John Doe Defendants' retention of GEICO's payments violates fundamental principles of justice, equity, and good conscience.

342.    By reason of the above, Friedman, Functional Rehab, and the John Doe Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $12,000.00.

## NINTH CAUSE OF ACTION
### Against the Contractor Physicians
### (Aiding and Abetting Fraud)

343.    GEICO repeats and realleges each and every allegation set forth above as if fully set forth at length herein.

344.    The Contractor Physicians knowingly aided and abetted the fraudulent scheme that was perpetrated on GEICO by Friedman, Functional Rehab, and the John Doe Defendants.

345.    The acts of the Contractor Physicians in furtherance of the fraudulent scheme included, among other things, knowingly performing the Fraudulent Services pursuant to the dictates of the John Doe Defendants who are unlicensed laypersons, knowingly exaggerating the level, nature, necessity, and results of the Fraudulent Services, and knowingly performing the Fraudulent Services as independent contractors and not as employees of Friedman or Functional Rehab.

346.    The conduct of the Contractor Defendants in furtherance of the fraudulent scheme was significant and material.  The conduct of Contractor Defendants was a necessary part of and was critical to the success of the fraudulent scheme because, without their actions, there would have been no opportunity for Friedman, Functional Rehab, and the John Doe Defendants to obtain payment from GEICO and other insurers.

347.    The Contractor Physicians aided and abetted the fraudulent scheme in a calculated effort to induce GEICO into paying charges to Friedman, Functional Rehab, and the John Doe Defendants for the medically unnecessary Fraudulent Services because they sought to continue profiting through the fraudulent scheme.

348.    The conduct of the Contractor Physicians caused GEICO to pay more than $12,000.00 pursuant to the fraudulent bills submitted through Functional Rehab.

349.    This extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

350.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief that the Court deems just and proper.

**TENTH CAUSE OF ACTION**
**Against Yousha, Yousha Medical, and the John Doe Defendants**
**(Common Law Fraud)**

351.    GEICO repeats and realleges each and every allegation contained in this Complaint as if fully set forth at length herein.

352.    Yousha, Yousha Medical, and the John Doe Defendants intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent bills seeking payment for the Fraudulent Services.

353.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that Yousha Medical was properly licensed and was being legitimately used to bill for the Fraudulent Services, making them eligible for payment pursuant to 11 N.Y.C.R.R. §65-3.16(a)(12) when in fact the John Doe Defendants

unlawfully and secretly controlled, operated, and managed Yousha Medical; (ii) in every claim, the representation that the Fraudulent Services had been rendered and were reimbursable, when in fact the claim submissions uniformly misrepresented and exaggerated the level, nature, necessity, and results of the Fraudulent Services that purportedly were provided; (iii) in every claim, the representation that the Fraudulent Services were eligible for reimbursement, when in fact the services were provided – to  the extent provided at all – pursuant to an illegal kickback scheme; (iv) in every claim, the representation that the Fraudulent Services were medically necessary when they were provided – to the extent provided at all – pursuant to the dictates of unlicensed laypersons, not based upon legitimate decisions by licensed healthcare providers; and (v) in every claim, the representation that the billed-for services were provided by employees of Yousha and Yousha Medical, when in fact virtually all of the billed-for services were provided by the Contractor Physicians.   The fraudulent billings and corresponding mailings submitted to GEICO that comprise, in part, the pattern of fraudulent activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibit "3".

354.    Yousha, Yousha Medical, and the John Doe Defendants intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Yousha Medical that were not compensable under the No-Fault Laws.

355.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $112,000.00 pursuant to the fraudulent bills submitted by Yousha, Yousha Medical, and the John Doe Defendants through Functional Rehab.

356.    Yousha, Yousha Medical, and the John Doe Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO

to recover punitive damages.

357.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

### ELEVENTH CAUSE OF ACTION
**Against Yousha, Yousha Medical, and the John Doe Defendants**
**(Unjust Enrichment)**

358.    GEICO repeats and realleges each and every allegation contained in this Complaint as if fully set forth at length herein.

359.    As set forth above, Yousha, Yousha Medical, and the John Doe Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

360.    When GEICO paid the bills and charges submitted by or on behalf of Yousha, Yousha Medical, and the John Doe Defendants for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on Yousha, Yousha Medical, and the John Doe Defendants' improper, unlawful, and/or unjust acts.

361.    Yousha, Yousha Medical, and the John Doe Defendants have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Yousha, Yousha Medical, and the John Doe Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

362.    Yousha, Yousha Medical, and the John Doe Defendants' retention of GEICO's payments violates fundamental principles of justice, equity, and good conscience.

363.    By reason of the above, Yousha, Yousha Medical, and the John Doe Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $112,000.00.

### TWELFTH CAUSE OF ACTION
**Against the Contractor Physicians**

**(Aiding and Abetting Fraud)**

364.    GEICO repeats and realleges each and every allegation set forth above as if fully set forth at length herein.

365.    The Contractor Physicians knowingly aided and abetted the fraudulent scheme that was perpetrated on GEICO by Yousha, Yousha Medical, and the John Doe Defendants.

366.    The acts of the Contractor Physicians in furtherance of the fraudulent scheme included, among other things, knowingly performing the Fraudulent Services pursuant to the dictates of the John Doe Defendants who are unlicensed laypersons, knowingly exaggerating the level, nature, necessity, and results of the Fraudulent Services, and knowingly performing the Fraudulent Services as independent contractors and not as employees of Yousha or Yousha Medical.

367.    The conduct of the Contractor Defendants in furtherance of the fraudulent scheme was significant and material.  The conduct of Contractor Defendants was a necessary part of and was critical to the success of the fraudulent scheme because, without their actions, there would have been no opportunity for Yousha, Yousha Medical, and the John Doe Defendants to obtain payment from GEICO and other insurers.

368.    The Contractor Physicians aided and abetted the fraudulent scheme in a calculated effort to induce GEICO into paying charges to Yousha, Yousha Medical, and the John Doe Defendants for the medically unnecessary Fraudulent Services because they sought to continue profiting through the fraudulent scheme.

369.    The conduct of the Contractor Physicians caused GEICO to pay more than $112,000.00 pursuant to the fraudulent bills submitted through Functional Rehab.

370.    This extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

371.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief that the Court deems just and proper.

### THIRTEENTH CAUSE OF ACTION
**Against Asher, BHNM Tech, and the John Doe Defendants**
**(Common Law Fraud)**

372.    GEICO repeats and realleges each and every allegation contained in this Complaint as if fully set forth at length herein.

373.    Asher, BHNM Tech, and the John Doe Defendants intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent bills seeking payment for the Fraudulent Services.

374.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that BHNM Tech was being legitimately used to bill for the Fraudulent Services, when in fact the John Doe Defendants unlawfully and secretly controlled, operated, and managed BHNM Tech; (ii) in every claim, the representation that the Fraudulent Services had been rendered and were reimbursable, when in fact the claim submissions uniformly misrepresented and exaggerated the level, nature, necessity, and results of the Fraudulent Services that purportedly were provided; (iii) in every claim, the representation that the Fraudulent Services were eligible for reimbursement, when in fact the services were provided – to  the extent provided at all – pursuant to an illegal kickback scheme; and (iv) in every claim, the representation that the Fraudulent Services were medically necessary when they were provided – to the extent provided at all – pursuant to the dictates of unlicensed laypersons, not based upon legitimate decisions by licensed healthcare providers.  The fraudulent billings and corresponding

mailings submitted to GEICO that comprise, in part, the pattern of fraudulent activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibit "4".

375.    Asher, BHNM Tech, and the John Doe Defendants intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through BHNM Tech that were not compensable under the No-Fault Laws.

376.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $54,000.00 pursuant to the fraudulent bills submitted by Asher, BHNM Tech, and the John Doe Defendants through Functional Rehab.

377.    Asher, BHNM Tech, and the John Doe Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

378.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## FOURTEENTH CAUSE OF ACTION
### Against Asher, BHNM Tech, and the John Doe Defendants
### (Unjust Enrichment)

379.    GEICO repeats and realleges each and every allegation contained in this Complaint as if fully set forth at length herein.

380.    As set forth above, Asher, BHNM Tech, and the John Doe Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

381.    When GEICO paid the bills and charges submitted by or on behalf of Asher, BHNM Tech, and the John Doe Defendants for No-Fault Benefits, it reasonably believed that it was legally

obligated to make such payments based on Asher, BHNM Tech, and the John Doe Defendants' improper, unlawful, and/or unjust acts.

382.    Asher, BHNM Tech, and the John Doe Defendants have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Asher, BHNM Tech, and the John Doe Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

383.    Asher, BHNM Tech, and the John Doe Defendants' retention of GEICO's payments violates fundamental principles of justice, equity, and good conscience.

384.    By reason of the above, Asher, BHNM Tech, and the John Doe Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $54,000.00.

**FIFTEENTH CAUSE OF ACTION**
**Against Reshylova, Zivert, and the John Doe Defendants**
**(Common Law Fraud)**

385.    GEICO repeats and realleges each and every allegation contained in this Complaint as if fully set forth at length herein.

386.    Reshylova, Zivert, and the John Doe Defendants intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent bills seeking payment for the Fraudulent Services.

387.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that Zivert was being legitimately used to bill for the Fraudulent Services, when in fact the John Doe Defendants unlawfully and secretly controlled, operated, and managed Zivert; (ii) in every claim, the representation that the Fraudulent Services had been rendered and were reimbursable, when in fact the claim submissions uniformly

misrepresented and exaggerated the level, nature, necessity, and results of the Fraudulent Services that purportedly were provided; (iii) in every claim, the representation that the Fraudulent Services were eligible for reimbursement, when in fact the services were provided – to  the extent provided at all – pursuant to an illegal kickback scheme; and (iv) in every claim, the representation that the Fraudulent Services were medically necessary when they were provided – to the extent provided at all – pursuant to the dictates of unlicensed laypersons, not based upon legitimate decisions by licensed healthcare providers.  The fraudulent billings and corresponding mailings submitted to GEICO that comprise, in part, the pattern of fraudulent activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibit "5".

388.    Reshylova, Zivert, and the John Doe Defendants intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Zivert that were not compensable under the No-Fault Laws.

389.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $13,000.00 pursuant to the fraudulent bills submitted by Reshylova, Zivert, and the John Doe Defendants through Functional Rehab.

390.    Reshylova, Zivert, and the John Doe Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

391.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

**SIXTEENTH CAUSE OF ACTION**
**Against Reshylova, Zivert, and the John Doe Defendants**

**(Unjust Enrichment)**

392.    GEICO repeats and realleges each and every allegation contained in this Complaint as if fully set forth at length herein.

393.    As set forth above, Reshylova, Zivert, and the John Doe Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

394.    When GEICO paid the bills and charges submitted by or on behalf of Reshylova, Zivert, and the John Doe Defendants for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on Reshylova, Zivert, and the John Doe Defendants' improper, unlawful, and/or unjust acts.

395.    Reshylova, Zivert, and the John Doe Defendants have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Reshylova, Zivert, and the John Doe Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

396.    Reshylova, Zivert, and the John Doe Defendants' retention of GEICO's payments violates fundamental principles of justice, equity, and good conscience.

397.    By reason of the above, Reshylova, Zivert, and the John Doe Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $13,000.00.

### SEVENTEENTH CAUSE OF ACTION
**Against Reshylova, Wellness Line, and the John Doe Defendants**
**(Common Law Fraud)**

398.    GEICO repeats and realleges each and every allegation contained in this Complaint as if fully set forth at length herein.

399.    Reshylova, Wellness Line, and the John Doe Defendants intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from

GEICO in the course of their submission of hundreds of fraudulent bills seeking payment for the Fraudulent Services.

400.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that Wellness Line was being legitimately used to bill for the Fraudulent Services, when in fact the John Doe Defendants unlawfully and secretly controlled, operated, and managed Wellness Line; (ii) in every claim, the representation that the Fraudulent Services had been rendered and were reimbursable, when in fact the claim submissions uniformly misrepresented and exaggerated the level, nature, necessity, and results of the Fraudulent Services that purportedly were provided; (iii) in every claim, the representation that the Fraudulent Services were eligible for reimbursement, when in fact the services were provided – to  the extent provided at all – pursuant to an illegal kickback scheme; and (iv) in every claim, the representation that the Fraudulent Services were medically necessary when they were provided – to the extent provided at all – pursuant to the dictates of unlicensed laypersons, not based upon legitimate decisions by licensed healthcare providers.  The fraudulent billings and corresponding mailings submitted to GEICO that comprise, in part, the pattern of fraudulent activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibit "6".

401.    Reshylova, Wellness Line, and the John Doe Defendants intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Wellness Line that were not compensable under the No-Fault Laws.

402.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $44,000.00 pursuant to the fraudulent bills submitted by Reshylova, Wellness Line, and the John Doe Defendants through Functional Rehab.

403.    Reshylova, Wellness Line, and the John Doe Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

404.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## EIGHTEENTH CAUSE OF ACTION
### Against Reshylova, Wellness Line, and the John Doe Defendants
### (Unjust Enrichment)

405.    GEICO repeats and realleges each and every allegation contained in this Complaint as if fully set forth at length herein.

406.    As set forth above, Reshylova, Wellness Line, and the John Doe Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

407.    When GEICO paid the bills and charges submitted by or on behalf of Reshylova, Wellness Line, and the John Doe Defendants for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on Reshylova, Wellness Line, and the John Doe Defendants' improper, unlawful, and/or unjust acts.

408.    Reshylova, Wellness Line, and the John Doe Defendants have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Reshylova, Wellness Line, and the John Doe Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

409.    Reshylova, Wellness Line, and the John Doe Defendants' retention of GEICO's payments violates fundamental principles of justice, equity, and good conscience.

410.    By reason of the above, Reshylova, Wellness Line, and the John Doe Defendants

have been unjustly enriched in an amount to be determined at trial, but in no event less than $44,000.00.

## JURY DEMAND

411.    Pursuant to Federal Rule of Civil Procedure 38(b), GEICO demands a trial by jury.

**WHEREFORE**, Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company demand that a Judgment be entered in their favor:

A.    On the First Cause of Action against the PC Defendants and Tech Companies, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that the PC Defendants and Tech Companies have no right to receive payment for any pending bills submitted to GEICO;

B.    On the Second Cause of Action against the Nominal PC Owners, Tech Company Owners, and John Doe Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but more than $260,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

C.    On the Third Cause of Action against the Nominal PC Owners, Tech Company Owners, Contractor Physicians, and John Doe Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but more than $260,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

D.    On the Fourth Cause of Action against Golfeyz, the Golfeyz SP, and the John Doe Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but more than $26,000.00, together with punitive damages, costs, interest, and such other and further relief as this Court deems just and proper;

E.      On the Fifth Cause of Action against Golfeyz, the Golfeyz SP, and the John Doe Defendants, more than $26,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

F.      On the Sixth Cause of Action against the Contractor Physicians, compensatory damages in favor of GEICO in an amount to be determined at trial but more than $26,000.00, together with punitive damages, costs, interest, and such other and further relief as this Court deems just and proper;

G.      On the Seventh Cause of Action against Friedman, Functional Rehab, and the John Doe Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but more than $12,000.00, together with punitive damages, costs, interest, and such other and further relief as this Court deems just and proper;

H.      On the Eighth Cause of Action against Friedman, Functional Rehab, and the John Doe Defendants, more than $12,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

I.      On the Ninth Cause of Action against the Contractor Physicians, compensatory damages in favor of GEICO in an amount to be determined at trial but more than $12,000.00, together with punitive damages, costs, interest, and such other and further relief as this Court deems just and proper;

J.      On the Tenth Cause of Action against Yousha, Yousha Medical, and the John Doe Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but more than $112,000.00, together with punitive damages, costs, interest, and such other and further relief as this Court deems just and proper;

K.      On the Eleventh Cause of Action against Yousha, Yousha Medical, and the John

Doe Defendants, more than $112,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

L.      On the Twelfth Cause of Action against the Contractor Physicians, compensatory damages in favor of GEICO in an amount to be determined at trial but more than $112,000.00, together with punitive damages, costs, interest, and such other and further relief as this Court deems just and proper;

M.      On the Thirteenth Cause of Action against Asher, BHNM Tech, and the John Doe Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but more than $54,000.00, together with punitive damages, costs, interest, and such other and further relief as this Court deems just and proper;

N.      On the Fourteenth Cause of Action against Asher, BHNM Tech, and the John Doe Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but more than $54,000.00, together with punitive damages, costs, interest, and such other and further relief as this Court deems just and proper;

O.      On the Fifteenth Cause of Action against Reshylova, Zivert, and the John Doe Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but more than $13,000.00, together with punitive damages, costs, interest, and such other and further relief as this Court deems just and proper;

P.      On the Sixteenth Cause of Action against Reshylova, Zivert, and the John Doe Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but more than $13,000.00, together with punitive damages, costs, interest, and such other and further relief as this Court deems just and proper;

Q.      On the Seventeenth Cause of Action against Reshylova, Wellness Line, and the

John Doe Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but more than $44,000.00, together with punitive damages, costs, interest, and such other and further relief as this Court deems just and proper; and

       R.     On the Eighteenth Cause of Action against Reshylova, Wellness Line, and the John Doe Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but more than $44,000.00, together with punitive damages, costs, interest, and such other and further relief as this Court deems just and proper.

Dated: April 14, 2025

      RIVKIN RADLER LLP

      By:   /s/  *Barry I. Levy*

          Barry I. Levy, Esq.
          Michael A. Sirignano, Esq.
          Philip P. Nash, Esq.
      926 RXR Plaza
      Uniondale, New York 11556
      (516) 357-3000

      *Counsel for Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company*